## THE STATE v. WALLACE CULPEPPER, Appellant.

### Division Two, March 18, 1922.

1. **CRIMINAL LAW: Robbery in First Degree: Instruction: Animus Furandi.** In a prosecution for robbery in the first degree by compelling the prosecuting witness to give defendant a check for $175, if such sum was due defendant from the prosecuting witness or if defendant in good faith believed it was due, he was not guilty of robbery because the *animus furandi*, the felonious intent, was wanting. And the court having given an instruction to that effect, it was not error to refuse a similar instruction asked by defendant.

2. ————: ————: **Evidence: Good Faith.** Where defendant was prosecuted for robbery in the first degree by compelling the prosecuting witness to give him a check for $175, and claimed on the trial that such sum was due him as commissions on two real estate deals, it was error for the trial court to exclude telegrams and a letter which clearly established defendant's agency in one of the deals and which might, in connection with other evidence, have aided the jury in determining the question of the good faith of defendant's contention.

3. ————: ————: **Cross-Examination of Defendant.** The cross-examination of the defendant in a criminal prosecution must be confined to matters testified to on his examination in chief; and if not so confined, it is presumed to be prejudicial, unless the contrary is made to appear. In this case, the cross-examination was prejudicial.

4. ————: ————: **State's Witness: Leading Questions by State's Attorney.** While the trial court has large discretion in permitting leading questions, particularly in formal and preliminary matters, or where the witness is timid or unwilling, yet, where, as in this case, the State's witnesses were not unwilling and some of them were admittedly unfriendly to defendant, it was prejudicial error to permit the State's attorney to lead the witness as was done in this case.

5. ————: ————: **Evidence: Hearsay.** The admission of hearsay evidence given by the prosecuting witness in a prosecution for robbery in the first degree is error.

6. ————: ————: ————: **Peace Bond.** It was prejudicial error in a prosecution for robbery in the first degree to permit the prose-

cuting witness to testify that he had filed a complaint against defendant and put him under a peace bond, the issues in that proceeding and in this one not being the same, nor the quantum of proof the same, and the jury might conclude that the order of the magistrate requiring defendant to give a bond to keep the peace was an adjudication on the merits of the case on trial against defendant.

Appeal from Howell Circuit Court.—*Hon E. P. Dorris,*. Judge.

REVERSED AND REMANDED.

*M. E. Morrow* for appellant.

*Jesse W. Barrett,* Attorney-General, and *Henry Davis,* Assistant Attorney-General, for respondent.

(1) The information charges the offense in the language of the statute and is sufficient. Secs. 3307, 3908, R. S. 1919; State v. Calvert, 209 Mo. 287; State v. Wilcoxsen, 38 Mo. 371; State v. Eddy, 199 S. W. 187. (a) It is no objection to the information that it does not in express terms charge an assault. The language employed necessarily involves the charge that an assault was committed. State v. Cantrell, 234 S. W. 800; State v. Brewer, 53 Iowa, 736; State v. Swafford, 71 Tenn. 163. (2) The asking of leading questions is largely a matter within the discretion of the trial court. State v. George, 214 Mo. 269; State v. Bateman, 198 Mo. 222; State v. Whalen, 148 Mo. 290. (a) Telegrams sent by a person bind no one except the sender, and as to other persons they are but hearsay and inadmissible in evidence. The refusal of evidence of self-serving statements of an accused is proper. The admission of hearsay evidence is harmless error when the same matter is properly shown by other evidence. State v. Pagels, 92 Mo. 300; State v. Wilson, 117 Mo. 570; State v. Moore, 168 Mo. 423; State v. Gatlin, 170 Mo. 534; State v. Boyd, 178 Mo. 2. (b) A defendant may be asked on cross-examination any question which will elicit details to throw light on the essential facts "referred to" in the

chief examination. State v. Foley, 247 Mo. 638; State v. Ivey, 192 S. W. 736. (c) It was proper to ask appellant if he had been convicted of crime. The question need not specify the particular crime. Sec. 5439, R. S. 1919; Kelly's Crim. Law, sec. 375. (d) It is discretionary with the trial court to admit in rebuttal facts which might have been offered in chief. State v. Baker, 262 Mo. 689; State v. Miles, 199 Mo. 530; State v. Weber, 156 Mo. 249. (e) Secondary evidence is admissible to prove the filing of court papers where it is shown that they have been lost and an unavailing search has been made for them. State v. Goddard, 146 Mo. 177; State v. Lentz, 184 Mo. 223.

HIGBEE, J.—The defendant and his wife, Ora Culpepper, were jointly charged with the crime of robbery in the first degree. The defendant was found guilty and sentenced to the penitentiary for five years, from which sentence he appealed. Mrs. Culpepper was acquitted. The information charged that the defendants, on January —, 1921, "at the County of Howell, did then and there unlawfully and feloniously make an assault (?) and one check for $175 and of the value of $175, the property of said Frank McGrath, from the person and against the will of the said Frank McGrath then and there, by putting the said Frank McGrath in fear of some immediate injury to his person, feloniously did rob, steal, take and carry away," etc.

The prosecuting witness, Frank McGrath, and the defendants lived in Mountain View, in Howell County. Culpepper was city marshal, and he and McGrath were real estate agents; not partners, but sometimes working together. Frank McGrath and his brother, G. A. McGrath, owned an eighty-acre tract of land in Shannon County, east of Mountain View, the title being in G. A. McGrath. They had sold this farm to A. E. Robinson, who lived in Nebraska, and deposited the deed in escrow in the People's Bank at Mountain View, to be delivered on the payment of the purchase price. Culpepper claimed

he had the land for sale for Robinson; that he had contracted to sell it to James Sentler; that Frank McGrath said to close the deal and he would make a deed directly to Sentler, with Robinson's consent; that Frank McGrath told him, Culpepper, he would see he got his commission of $125. He also claimed that McGrath got a commission of $100 on a land deal he, Culpepper, negotiated for Mr. Todd, and paid Culpepper only $50 of this and that he owed him the other $50.

Frank McGrath testified that Culpepper called him into his house, saying, "I have a telegram from Robinson and want to show it to you." Culpepper had a deal on with Robinson. Witness testified: He locked the door and said, "You sit down and write me a check or I will kill you. You did not try to help me in that Robinson deal, and you made me pay a fine for cursing you and knocking you down, and I am going to make you pay that." I said, "Wallace, I don't owe you any money in that Robinson deal; you never sold the farm for me, but for Robinson, and you ought to go after him." And he said, "Robinson is up in Nebraska and I can't make him pay and I am going to make you pay it. Sit right down and write that check or I will kill you." I was afraid of him. He knocked me down once before; he was a good big size. He said he went to the justice of the peace at Monteer and filed an attachment against the corn on Robinson's place and there was no bonded officer in Birch Tree to sign the attachment, and he said, "It would cost all I could get and I will make you pay it." He said, "Write that check now." I knew he had a gun. He did not draw the gun, but I knew he could beat me to death without a gun. I said, "What do you want me to write on the check?" And he said, "$125 on the Robinson commission and $50 on the Todd commission." I wrote that, and he took the check and indorsed it and handed it around the door to his wife. He said, "You sit there till I get this check cashed." I saw his wife go around there; she was gone about fifteen minutes, and when she came back she made a racket with the stove

poker. He then said, "Now you can go on about your business and don't speak to anybody about this." I promised I would not. He told me he would kill me if I told anybody. . . . I wrote the check because I was afraid of him and had to. He told me time and again he always carried a gun. I only saw Culpepper in the house. (Here the check was read in evidence.) He (Culpepper) never claimed I owed him a commission. I don't owe him a cent. I may have testified at the preliminary examination that he claimed all of the commission. Todd owned forty acres near Mountain View. Culpepper just showed that farm to the purchaser. I turned the buyer over to him the first day. I showed it the second day. I brought the buyer back to Mountain View and they made the deal. Culpepper was in the real estate business. We were working together. We were not partners. If he made the deal, he got half the commission. If I sold it, I got all. I saw the defendant's exhibit 1 before the day of the robbery; don't know that I saw exhibit 3. I don't know if Wallace is claiming a commission from me or not. He sold the farm to Sentler for Robinson. I told Sentler that if Culpepper would write to Robinson and have Robinson write to the bank and tell me to make a new deed instead of the one made to him, we would do that. Robinson sent a telegram to Culpepper to see me for the terms on the deal when I first sold the farm. Culpepper came to my office and said, "McGrath, I have sold that Robinson place and I have a telegram from Robinson and it says to see you for the terms," and I took him to the bank for him to see the contract.

Defendant offered in evidence, as part of McGrath's cross-examination, Exhibits 1, 2 and 3, the first two being telegrams and the third a letter, all addressed to W. W. Culpepper and signed by A. E. Robinson. They were excluded as incompetent. They are as follows:

"Exhibit 1. I will sell my eighty acres for $2500. Send me bank draft for $800 and see Frank McGrath for terms.

"Exhibit 2. I will accept the $700. Send to Box 987, Scotts Bluff, Nebr.

"Exhibit 3. I mailed instructions to the People's Bank some time ago in regard to our deal. I think you will find the instructions plain enough and fair enough."

Witness continuing: Robinson paid $500 cash and was to pay $200 a year. We made the deed and put it in the bank with the payments. He was to get the deed when he made all the payments. Afterwards, Culpepper said Robinson had sent him a telegram to see me about the deal. We went to the bank, got the contract and the deed, and I said to Culpepper, there is the way it is; he was making the other deal for Robinson. Robinson had never authorized me to withdraw that deed and make it to some one else.

As to the $50 Todd commission, witness testified: I turned the buyer over to Culpepper who showed him the farm the first day and I took him out the second day and he said he would take the place. We went to the banker, and I left it with hi mto get up the deeds. Culpepper said if I would send a buyer to him we would split the commission. I told Sentler I would sell him that farm and make him a deed to it if he would pay all cash if it was all right with Robinson. I did not offer to make a deed to Sentler.

James Sentler, for the defendants, testified: I bought the Robinson eighty acres through Wallace Culpepper. Culpepper got a telegram from Robinson to go to McGrath for the terms. I went to McGrath. He said to go down to the bank and get the contract and he would fix the papers. We went to the bank and fixed thecontract, and I laid down $100 and soon after I paid $600, but never got the papers. I got the money back finally. McGrath never did exactly refuse, but just kept putting us off. I took my wife there twice and he always let on as if he couldn't make it then.

Defendant then read in evidence a contract dated September 4, 1919, for the sale by Jesse G. Todd of 40 acres in Howell County to Alonzo Manley for $2000. It

recites that W. W. Culpepper is entitled to a commission of five per cent for the sale.

The defendant, Wallace Culpepper, testified: Frank McGrath came to my house January 20, and said: Have you heard anything more of the Robinson deal? I said, Frank, you owe me $175 commission on this and the Todd deal and I want my money and if you don't pay it I will sue you. He said he would rather pay me than have a lawsuit; that he had no money or blank check. I got a blank check and he wrote the check and gave it to me. I indorsed it and gave it to my wife. She went out the door. It was not locked. I didn't tell him I would kill him if he didn't sign the check. I threatened to sue him. I took Manley to the Todd place and showed it to him. I did not agree to divide the commission with Mc-Grath. I never worked with him. The commission was to be $100. I was standing in the bank one day and Mc-Grath came out and said, "I have been in there and divided our commission in the Todd deal; it is right there in my pocket and you can get it when you can." I told him that it belonged to me. That was quite a while before January 20. I asked him at different times to pay me and he said he didn't owe me anything. I sold the other farm to Sentler and got a telegram to see Mc-Grath for terms. We went to McGrath and he said to close the contract and he would make a deed direct to Sentler with Robinson's consent. I closed the deal with Robinson's consent, but McGrath would never make it. He always did something to delay keeping his promise to make the deed. When I would press him for it to get my commission, he would say, "I'll see that you get your commission."

Other matters will be mentioned in the discussion of the case.

I.   The appellant has filed no brief. We have, however, carefully examined the record, as is our duty under the statute.

If McGrath owed Culpepper $175 for commissions on the Todd and Robinson deals, or if Culpepper be-

lieved he owed him that sum, then the defendant was not guilty of robbery because the *animus furan-di*, the felonious intent, was wanting. [State v. Brown, 104 Mo. 365, 373.] The court gave an instruction for the State substantially following the form of instruction which we said in the Brown Case should have been given. The court did not err in refusing the only instruction asked by the defendant, because it was included in the one given, above referred to.

**Felonious Intent.**

II. The State's contention was that McGrath not only did not owe Culpepper $50 on account of the Todd, or $125 on account of the Robinson deal, but that Culpepper knew that McGrath owed him nothing on either account, and that his claim was not made in good faith. The case turned chiefly, if not solely, on these contentions. McGrath testified that he had paid Culpepper one-half of the $100 he received on that deal, while Culpepper testified that McGrath had no interest in it. That made it an issue for the jury.

**Defendant's Agency: Good Faith.**

The Robinson deal was more complex. While the eighty acre tract really belonged to McGrath and his brother, G. A. McGrath, the title was in the latter. They had sold it to Robinson, who lived in Nebraska, and deposited the contract of sale and the deed in the People's Bank to be delivered when Robinson made the payments mentioned in the contract. Culpepper claimed Robinson had authorized him to sell the land; that McGrath was to fix the terms and make a deed to the purchaser; that he found a purchaser on terms approved by McGrath; that McGrath directed him to close the deal and agreed that he would make a deed to a purchaser; that he unreasonably delayed making the deed, but assured Culpepper that he would get his commission of $125, and so, through McGrath's fault, the deal was not completed.

The two telegrams and the letter from Robinson to Culpepper, defendant's exhibits 1, 2 and 3, clearly established defendant's agency (their genuineness not be-

ing questioned), and were admissible; they might, in connection with the other evidence, have aided the jury in determining the question of the good faith of defendant's contention.

III. The court, over the defendant's objection, permitted the prosecuting attorney to cross-examine the

Cross-Examination. defendant on matters not referred to in his examination in chief. The following, and other questions, were asked:

"Did you ever tell any body you were going to sue Frank McGrath?

"Did you write Robinson and tell him that he owed you $125?

"Did you not sue Robinson for the commission?"

It is apparent that the answers drawn from the defendant on these questions were prejudicial to the defendant in regard to his claim that McGrath owed him a commission on the sale of the Robinson land. It might well be, in defendant's view of the matter, that while Robinson was directly liable to him, yet, under the circumstances detailed in the evidence, McGrath, having broken off and defeated the deal, was also liable on his express promise to see that Culpepper would get his commission. The cross-examination of the defendant must be confined to matters testified to on his examination in chief. [R. S. 1919, sec. 4036; State v. McGraw, 74 Mo. 573.] If not so confined, it is presumed to be prejudicial unless the contrary is made to appear. [State v. Pfeifer, 267 Mo. 23.] It was urged in the Pfeifer Case (at page 31), as it is here, that the State is not to be confined in its cross-examination to a mere categorical reiteration of the examination in chief. In State v. Foley, 247 Mo. 607, it was held that defendant might be cross-examined as to details of transactions touched upon in his examination in chief. But this case presents a different complexion. The defendant, in his examination in chief, did not touch upon nor open the door for the cross-examination complained of.

IV.   The court also permitted the prosecuting at-
torney in the examination in chief of several witnesses
for the State to propound direct, leading ques-
tions on material matters over the objection
of the defendant.   The learned Attorney-
General, in his brief in reference to this complaint, says
(apologetically) :

Leading
Questions.

"The trial court permitted the prosecuting attorney
to ask a large number of leading questions, and this is
assigned as reversible error.   There is no doubt but that
it was not necessary to put some of the questions in the
leading form.   In some of them the apparent use was to
refresh the memory of the witness, and in the main the
trial was facilitated by the use of them.   It has always
been held by this court that the asking of leading ques-
tions is largely discretionary with the trial court.   We
fail to see where appellant was injured in any manner on
account of the leading character of the questions."

It may be conceded that the trial was facilitated by
resort to leading questions, but may not that course have
unduly facilitated the defendant's conviction?

It is true that the trial court has a large discretion
in permitting leading questions, particularly in formal
and preliminary matters, or where the witness is timid
or unwilling.   [State v. George, 214 Mo. 262, 269.]   But
in this case the witnesses for the State were not unwill-
ing, while some admittedly were unfriendly to the de-
fendant.   The court should not have permitted the prose-
cuting attorney to lead the witnesses.   It was prejudicial
to the defendant.   [State v. Fannon, 158 Mo. 149, 158.]
The rule is that leading questions are not permitted.
[Engleking v. Railroad, 187 Mo. 158, 164; 40 Cyc. 2422.]
If the practice adopted by the prosecuting attorney, with
the sanction of the court, were tolerated, it would abro-
gate the rule entirely.

V.   The court also permitted the prosecuting wit-
ness, McGrath, to testify that the banker, with whom the
money in the Todd deal was deposited, said to him:

Hearsay.       "The Todd deal is closed up and Culpepper told
me you were to have one-half of the commission,
and he wrote me out a deposit slip for that amount."
This statement was not made in the presence of either of
the defendants and was pure hearsay.

VI.   The prosecuting witness was permitted to tes-
tify over the defendant's objection, that he filed a com-
plaint against the defendant and put him under a peace
bond.   Section 3748, Revised Statutes 1919, provides that
Other          if the jury finds there is good reason to fear
Offenses.      the commisison of the offense charged, they
shall render a verdict of guilty against the de-
fendant, and the magistrate shall require the defendant
to enter into a recognizance, etc.

It is manifest that the issues in that proceeding and
in the case at bar were not the same, nor was the *quan-
tum* of proof the same.   This was a close case on the
evidence.   The jury might conclude that the order of the
magistrate requiring the defendant to give a bond to
keep the peace was an adjudication on the merits of the
case on trial against the defendant.   It was well calculated
to prejudice the jury and should not have been received,
even if the record of the magistrate had been produced.

There are other errors complained of, but they can
be avoided on a retrial of the case.

The judgment is reversed and the case remanded.
All concur.