## MELVIN C. TIPTON v. STATE.

No. A-3803.     Opinion Filed Feb. 17, 1923.
(212 Pac. 612.)

(Syllabus.)

1. **Indictment and Information—Where Complaint Charged Robbery in First and Second Degrees, Amendment to Information Permissible Charging First Degree Only.** Where an original complaint charging robbery is couched in such language as to charge robbery in both the first and second degrees, it is not error for the court to permit the county attorney to amend the information to charge robbery in the first degree only.

Held, further, that the preliminary hearing was sufficient to support the charge as amended.

2. **Trial—Instructions—Failure to Define Robbery in Second Degree not Error Where no Evidence to Support it.** Where one is charged with robbery in the first degree, the court committed no error in failing to instruct the jury, defining robbery in the second degree, when there was no evidence offered tending to show a lower degree of the offense.

3. **Robbery—Forcing Delivery of Property Through Fear and Duress.** Where one points a pistol at another, and with threats and menace of death compels the person assaulted to leave the presence of the one making the assault to procure money and property, which, when procured, is delivered to the person making the assault, while the person assaulted is under continued fear and duress, this constitutes robbery under the circumstances outlined in the opinion.

4. **Robbery—Taking of Something of Value from Another by Force or Personal Fear, Gist of Robbery—Motives for Robbery Immaterial.** The taking of something of value from another by means of force or personal fear is the gist of the offense of robbery. Whether the motives leading up to the robbery grew out of avarice, revenge, or other like motive is immaterial, and the court committed no error in refusing to permit an extended examination touching such motives.

5. **Robbery—Forcibly Collecting Uncertain Unliquidated Damages as Robbery.** In a robbery case, where the taking of the property is for the purpose of forcibly collecting uncertain unliquidated damages as compensation for an alleged felonious assault on the taker's wife, such forcible taking may constitute robbery and does not come within the rule that the forcible taking and retention of the property of another for the purpose of paying or securing the payment of a debt might not be deemed robbery.

6. **Same—Evidence Sustaining Conviction of Robbery in First Degree.** The evidence as a whole, as outlined in the opinion, held sufficient to support the charge of robbery.

Appeal from District Court, Bryan County; George S. March, Judge.

Melvin C. Tipton was convicted of robbery in the first degree, and he appeals. Affirmed.

Warren B. Phillips, Hatchett & Ferguson, McPherren & Cochran, and J. A. Shirley, for plaintiff in error.

Geo. F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

BESSEY, J. Melvin C. Tipton, plaintiff in error, was on April 1, 1920, by verdict of a jury found guilty of the crime of robbery in the first degree, committed on March 1, 1920. His punishment was fixed at confinement in the state penitentiary for a term of 10 years. From the judgment on the verdict he appeals.

The facts in the case, as shown by the state's evidence, may be summarized as follows:

The accused was a resident of the city of Durant. In the early part of December, 1919, he sold his business in Durant and went to Burkburnett, Tex., where he was temporarily employed, leaving his wife and two children in Durant, at the home of Mrs. Edwards. Some time in February, 1920, he received a letter from his wife, complaining of insulting treatment towards her by their family physician, a Dr. Armstrong. Upon receipt of this letter accused returned home, and his wife informed him more fully concerning the abusive treatment complained of. The accused was not satisfied that his wife had fully disclosed what had occurred between her and the doctor, and after many futile efforts to induce her to make further disclosures, and having for several days worried

over what had been disclosed and what he suspected the truth in fact might be, he took his two children, on March 1, 1920, over to the home of his mother, and then went to a neighbor's house and telephoned Dr. Armstrong to come to his rooms immediately. Soon thereafter Dr. Armstrong arrived at the home of the accused, where he was met at the door by the wife of the accused and invited in; upon stepping inside the door the accused covered the doctor with a pistol, and ordered him to hold up his hands, directing his wife to search the doctor for weapons. Finding no weapons, the doctor with his hands still held aloft was ordered in the face of this pistol pointed towards him to sit down and relate to the accused all of the transactions that had occurred between the doctor and the wife of the accused in the latter's absence. Mrs. Edwards, in a room adjoining, heard the accused say: "I ought to shoot you like a dog." Anticipating trouble, Mrs. Edwards went to a neighbor's house and telephoned the police; a few minutes later a policeman came, and Mrs. Edwards detailed to the policeman what she had heard. The policeman then went inside the room, and was informed by both Dr. Armstrong and the accused that his presence there was unnecessary; that they were just having an argument over a matter of business which they could adjust among themselves. The policeman then stated that he came there as a police officer, on request, but that if he was not needed he would leave, and then departed without further action.

In this connection Dr. Armstrong claims that the accused up to this time had been threatening to kill him; that he kept his pistol pointed towards him, and when the officer approached the accused told the doctor not to divulge to the officer the nature of the difficulty, that if he did so he could kill him, and that he placed the pistol in his righthand coat pocket and kept his hand in this pocket during the time the officer

was in the room, in such a manner as to be able to execute his threat. After the officer left the accused took the pistol out of his pocket, and again pointed it at the doctor. The accused claims that the doctor admitted to him that he had abused, mistreated, and insulted the wife of the accused, and offered a monetary settlement to right the wrong he had done, so far as he was able to do so; that after an extended discussion the doctor offered to pay the accused the sum of $1,000 in cash, to turn over to him a nearly new Dodge automobile, and to give him a note for $5,000, secured by a real estate mortgage. The doctor, on the other hand, testified that the admissions made concerning the treatment of the wife of the accused were made at the point of a pistol, through fear of immediate death, and that the accused with a drawn pistol exacted a monetary settlement; that he, while laboring under this fear and menace, agreed to pay the accused $1,000, to turn over to him the automobile, and to execute the $5,000 note in favor of the accused.

Either by agreement or through imminent fear of his life, Dr. Armstrong left the house and went to the bank for the purpose of securing the $1,000, followed by Tipton some distance in the rear; the doctor went into the bank alone, procured a cashier's check for $1,000, made payable to himself, and, according to previous agreement met the accused near the bank at the foot of the stairs leading up to a lawyer's office. In this office the cashier's check was indorsed and delivered by the doctor to the accused. In the meantime the doctor had telephoned to have his automobile sent down, to be left in front of this office, without disclosing what had occurred. The doctor directed the lawyer to draw a note for $5,000, which was done. The mortgage to secure the same could not be executed at that time, because the doctor did not remember the description of the land, and it was agreed that the note should be left with the lawyer, and it and the

security therefor delivered later. Dr. Armstrong claims that during these transactions in the lawyer's office the accused kept his right hand in his right coat pocket, and that the money was paid over and the automobile delivered to the accused while he was laboring under imminent fear and duress.

The day following these transactions Dr. Armstrong left Oklahoma to confer with a brother in Texas concerning this difficulty. When he returned to Durant he was approached by the sheriff, and asked to sign a complaint charging the accused with robbery. This the doctor refused to do, and gave as his reason for such refusal that he was afraid of the accused. The sheriff then made some further investigation, and himself made the affidavit instituting the prosecution in this case. For the sake of brevity many of the incidents appearing in the testimony are omitted from this narrative of the facts.

A preliminary examining trial was had, and the accused was held to answer to the district court for the crime of robbery. The proceedings in the examining trial are not incorporated in the record here. Pursuant to the holding of the examining magistrate the county attorney filed an information in the district court, charging the accused with the crime of robbery, in language that might be construed to charge the crime of either robbery in the first degree or robbery in the second degree. Later on the county attorney secured permission from the court to file an amended information, specifically charging robbery in the first degree. The accused now contends that he was not accorded a preliminary examining trial supporting the charge of robbery in the first degree.

The language used in the first information filed stated: "* * * Did then and there, and in the manner and by the means aforesaid, unlawfully and feloniously put the said Dr. Armstrong in fear of unlawful, immediate and future in-

jury to his person, thereby by the force and fear aforesaid did then and there produce in the mind of said Dr. Armstrong such fear of immediate and future injury to his person as was sufficient to and did overcome all resistance," etc.

Portions of the information as amended are as follows:

"* * * Did then and there, in the manner and by the means aforesaid, unlawfully and feloniously put the said Dr. Armstrong in fear of unlawful and immediate injury to his person, thereby, by the force and fear aforesaid, did then and there produce in the mind of the said Dr. Armstrong such fear of unlawful and immediate injury to his person as was sufficient to and did overcome all resistance of the said Dr. Armstrong; and while the said Dr. Armstrong was under the influence of the fear aforesaid, the said defendant did then and there unlawfully and feloniously rob, take, steal, and carry away, from the person and immediate presence of the said Dr. Armstrong, to wit, one cashier's check for $1,000, of the value of $1,000; one promissory note for $5,000, of the value of $5,000; and one Dodge passenger car of the value of $1,000; and all of the value of $7,000, in good and lawful money of the United States of America, against the will and consent of the said Dr. Armstrong, and with the unlawful and felonious intent on the part of the said defendant then and there to convert and appropriate said property to his own use and benefit, and to deprive the true owner, Dr. Armstrong, thereof, contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the state of Oklahoma."

A demurrer to the amended information was interposed, upon the ground that the facts stated were insufficient to constitute the crime of robbery, and that the transcript of the examining magistrate, including the testimony taken at the preliminary hearing, were insufficient to support the information. The accused contends that in the preliminary hearing he was charged with and held for robbery in the second degree, and that the court erred in permitting the county at-

torney to amend the information so as to charge robbery in the first degree without any preliminary hearing as a condition precedent to an information charging robbery in the higher degree.

The proceedings in the preliminary hearing were not made a part of this record. This court has held in a number of cases that, where no specific affirmative record appears, it will be presumed that the accused has had a preliminary hearing as a basis for the information filed. The trial court upon consideration of the demurrer to the amended information in effect decided that the amendment charging robbery in the first degree was proper, and we think by fair inference decided that the findings in the examining trial were sufficient to support the charge. The original information was ambiguous, some of the language used indicating that the offense stated was robbery in the first degree, while other portions of the language used may have been considered to import robbery in the second degree. The amendment was doubtless allowed by the trial court to clarify this issue.

Robbery is defined by section 1784, Comp. Stat. 1921, thus:

"Robbery is a wrongful taking of personal property in the possession of another from his person or immediate presence and against his will, accomplished by means of force or fear."

By the terms of section 1787 it is provided that the fear which constitutes the crime robbery may be the fear of an unlawful injury, immediate or future, to the person or property of the person robbed. Bearing this last provision in mind, we find the degree of robbery defined by section 1790, Comp. Stat. 1921, thus:

"Robbery, when accomplished by the use of force, or of putting the person robbed in fear of immediate injury

to his person, is robbery in the first degree. When accomplished in any other manner, it is robbery in the second degree.''

It appears, therefore, that where the taking is accomplished by putting the person robbed in fear of immediate peril it is robbery in the first degree; where it is accomplished by means of fear of future injury to the person or property it would be robbery in the second degree. In the absence of any specific record to the contrary, this court will presume, under the conditions here recited, that the testimony taken at the examining trial and the findings of the examining magistrate were sufficient to support an information for robbery in the first degree.

Where an offense is by statute divided into degrees, the jury may find the accused guilty of any offense the commission of which is necessarily included in that with which he is charged. If there was no error in permitting the amendment—and we think there was none—the information as amended was sufficient to cover either degree of robbery. Section 2740, Comp. Stat. 1921. The accused's punishment was fixed at the minimum for robbery in the first degree, and he now contends that the court erred in failing to submit to the jury the issue raised by the evidence, as he claims, of robbery in the second degree. In other words, it is contended that under the evidence he was entitled to such an instruction, which if given might have operated to mitigate his punishment.

All of the testimony on the part of the state, supplemented in part by the testimony of the accused himself, indicates that if Dr. Armstrong surrendered the money and the automobile under fear of personal violence, it was through fear of immediate peril; there is nothing in the record beyond a mere conjecture or suspicion that he handed over this property through fear of future violence. This being true, there was

no issue of robbery in the second degree, and the court committed no error in failing to instruct the jury upon an issue not raised by the testimony. The accused in the court below made no request for such an instruction. The case was tried on the theory that he was guilty of robbery in the first degree, or nothing. Where there is no evidence offered tending to show a lower degree of the crime charged, the court will not be required to give an instruction defining such degree. Nail v. State, 18 Okla. Cr. 40, 192 Pac. 592; Leseney v. State, 13 Okla. Cr. 247, 163 Pac. 956; 1 Randall's Instructions to Juries, § 315.

The accused's theory of the affair was fairly submitted to the jury under the following instruction:

"However, you are further instructed that, if you find or have a reasonable doubt as to the matter, after Dr. Armstrong arrived at the home of the defendant in response to his invitation to do so, at the time above mentioned, the defendant accused him of having insulted, injured, or wronged his wife, Mrs. Eva Tipton, and that the defendant threatened to make the fact that the said Armstrong had so insulted, injured or wronged his wife public, or threatened to bring civil action in a court for such alleged insult, injury, or wrong to his wife, which the defendant had a right to do, and that the said Armstrong then and there agreed to pay the defendant $7,000 in money or property, or any amount of money or property, if the defendant would not bring the matter into court or give it publicity, and that in pursuance to said promise on the part of the said Armstrong the said Armstrong and the defendant met at the office of the said Chas. A. Phillips, and that the said Armstrong then and there in pursuance to this agreement delivered and paid the defendant said property, then and in that event the defendant would not be guilty of robbery, and you should acquit him."

The accused earnestly insists that the facts proved indicate that the offense, if it was an offense, was not robbery; that at most it was a species of blackmail or criminal conspiracy; that the fact that Dr. Armstrong left the home of the accused, unaccompanied by the accused, and went alone to the bank to procure the money, and, after having obtained the money, went to the place where they had agreed to meet, indicates that he was then free to inform others of his plight or to make his escape, and that he was no longer laboring under fear of immediate personal violence.

In an early English case it was held to have been robbery where thieves came to rob a person, and, finding little about him of value, by threats and menace of death compelled this person through fear to promise to and to go away and return with more valuable property, which he delivered to the robbers while still under fear and duress. I Hale, Pleas of the Crown, 532.

The same rule applies where under fear and duress one draws a check or draft for the payment of money, and, acting under imminent fear, delivers the same to the one making the demand. Rex v. Edwards, 6 Carrington & Payne, 521.

These cases are cited and commented upon with approval in I Wharton's Criminal Law (10th Ed.) 749, and 2 Russell on Crimes, 112.

In the case of Harris v. State, 32 Tex. Cr. R. 279, 22 S. W. 1037, the facts shown were that a policeman accosted two women returning from work after dark, and, at the point of his pistol, placed them under arrest; they protested that they had done nothing; the policeman then offered to release them if they would pay him money. One of the women paid him $1, all of the money she had; the other woman had no money. Both were then compelled to go, at the point of the pistol,

to a lonely spot, where he ravished one of the women. In passing along the road and paths to this place they met several persons, but through fear of personal violence neither of the women made any outcry. Held, that the force and fear shown was sufficient to support a charge of robbery as well as one of rape.

We have been unable to find any recent case involving facts similar to those here related, but on the authority of the cases cited, and giving a reasonable application to the elements of the crime, we see no reason why a short separation of the accused and the person robbed, who was still laboring under apprehension and fear of personal violence, should make the case any different from one where there was no such separation.

The accused further insists that his rights were prejudiced by the court's refusal to permit him to prove in greater detail that for 19 days and nights before the commission of the offense charged he was in a worried and disturbed state of mind, culminating in the assault upon the doctor, which the accused claims was made, not for the purpose of robbing him, but for the purpose of ascertaining from the doctor himself whether the statements made by the wife of the accused were true; that he suspected that she had not fully disclosed all that had taken place between her and the doctor; and that the showing of this condition of mind would tend to prove that his motive was not robbery.

Ordinarily it is not reversible error for the court to limit the extent and scope of the examination of witnesses touching remote details of facts and circumstances leading up to the commission of the offense, where the facts sought amount to nothing more than uncertain or conjectural explanations of the motives of the accused. 10 R. C. L. 926.

The taking of something of value from another, by means of force or fear of injury, is the gist of the offense of robbery; whether the motives leading up to the assault grew out of avarice, revenge, or curiosity is immaterial. None of these motives would justify robbery, or change the degree of the offense, or operate to mitigate the punishment therefor. In homicide cases the state of mind, or the motives of the accused, leading up to the assault, are often material as explanatory of the question of malice or premeditation, but we can see no reason why any motive not explanatory of a design to rob would have any bearing on a robbery case.

If the doctor made a felonious assault upon the wife of the accused, as accused claims he did, such conduct was indeed reprehensible. Even so, that would not justify the injured husband in collecting unliquidated damages at the point of a pistol to compensate him for such felonious assault. Many courts have held that the taking and retention of the property of another for the purpose of paying or securing the payment of a debt would not necessarily constitute larceny or robbery. This is argued pro and con in People v. Smith (N. Y.) 5 Parker Cr. R. (N. Y.) 490; Commonwealth v. Stebbins, 8 Gray (Mass.) 492. We refuse, however, to extend this somewhat mooted doctrine so as to cover cases where the taking of the property is for the purpose of forcibly collecting uncertain unliquidated damages for an alleged criminal assault. To hold otherwise would amount to an invitation to those aggrieved by the criminal acts of others to assume the functions of judge, jury, and sheriff to violently and forcibly compensate themselves for the injury or assumed injury inflicted, to any extent deemed adequate by the aggrieved person alone, and that such violence would amount to no more than a mere trespass or simple assault.

By his own admissions, the accused by deception arranged for this interview with the doctor, and the doctor at the point of a pistol agreed to compensate the accused for the injury, suspected or real, to the latter's wife; early in the controversy the cupidity of the accused became apparent. But "the jingling of the guinea helps the hurt that honor feels." The offer to pay, or the forced agreement to pay, money to right this real or fancied wrong had a very soothing effect on the worried mind of the accused.

We think that all the physical facts shown, and the circumstances surrounding them, justified the jury in finding that the doctor surrendered at least a portion of this property under fear of imminent violence, and that the charge of robbery in the first degree was supported by the evidence.

The judgment of the trial court is therefore affirmed.

MATSON, P. J., and DOYLE, J., concur.