EDWARDS, Plaintiff in error, v. STATE, Defendant in error.
[No. State 59.]
HILL, Plaintiff in error, v. STATE, Defendant in error.
[No. State 60.]
HILL, Plaintiff in error, v. STATE, Defendant in error.
[No. State 61.]

*Nos. State 59–61. Argued November 6, 1970.—Decided
December 1, 1970.*
(Also reported in 181 N. W. 2d 383.)

106

For the plaintiff in error William Edwards, Jr., there was a brief by *David J. Hase,* attorney, and *Grootemaat, Cook & Franke,* and *Eugene W. Murphy, Jr.,* of counsel, all of Milwaukee, and oral argument by *Mr. Hase.*

For the plaintiff in error Robert Louis Hill there were briefs and oral argument by *James H. McDermott,* state public defender.

For the defendant in error the cause was argued by *Joseph M. Wilson,* assistant district attorney of Mil-

waukee county, with whom on the brief were *Robert W. Warren,* attorney general, and *E. Michael McCann,* district attorney.

HALLOWS, C. J. Both Edwards and Hill raise the issue of whether the trial court erred in refusing to require Higgins, a narcotic user and a witness for the prosecution, to display his arm to the jury or to Detective Thelen, a witness, after Higgins had admitted the use of heroin by injection into his arm about seventy-two hours before the time he testified. Edwards raises two additional questions: (1) Whether the court erred in limiting the questioning of Detective Thelen concerning Higgins' reputation for truth and veracity, and (2) whether it was error for the trial court to instruct the jury that an indebtedness is not a defense to attempted armed robbery.

Only so much of the facts are given as is necessary to understand the issues raised. According to Higgins, Edwards and Hill came to the front door of an apartment building in which he lived and when he opened the door they forced their way in, pointed a gun at him and demanded his money. He claims Edwards and Hill forced him up the stairway to his second-floor apartment. About this time, one Ronald Bufford entered the first-floor stairway of the apartment building to visit his sister. He testified he heard Higgins say something about a stickup, but he continued to ascend the stairway. When he reached the top of the stairs, Bufford saw a gun in Hill's hand. A few seconds later, Hill fired the gun, hitting Bufford and immediately thereafter both Edwards and Hill left without taking any money from Higgins.

Edwards testified that prior to coming to the apartment with Hill he had telephoned Higgins, an old acquaintance, and asked him to pay the $150 Higgins in September, 1965, had agreed to pay Edwards for clothes. Edwards claimed Higgins voluntarily opened the door and invited him and Hill upstairs. When Edwards asked

Higgins for the $150, Higgins claimed he could not get into his apartment because he had locked himself out.

At the trial the defense tried to impeach Higgins' testimony by showing him to be a narcotic addict and therefore prone to lying and when on the stand he had lied, particularly in respect to the last time he had taken heroin. Higgins admitted he had taken heroin by an injection in his arm about seventy-two hours prior to taking the stand. When asked the exact number of hours prior to his testimony he had injected heroin in his arm, he answered it was not between twenty-four or forty-eight hours but closer to seventy-two hours. The defense then requested the court to order Higgins to display his arm to the jury. The trial court denied the request and ruled the jury was not competent to ascertain from the existence of a needle mark the recentness thereof and the displaying of the arm would be prejudicial. The defense later requested that Higgins be required to display his arm to Detective Thelen whom it claimed was an expert and could determine the recentness of needle marks left by the injection of heroin; this request was also denied.

It is generally recognized heroin addicts are often liars and perhaps notoriously so while under the influence of the narcotic; therefore, evidence of the use of heroin by a witness recent enough to affect the witness is within the scope of cross-examination for impeachment purposes. *See People v. Boyd* (1959), 17 Ill. 2d 321, 326, 161 N. E. 2d 311. In *People v. Lewis* (1962), 25 Ill. 2d 396, 185 N. E. 2d 168, the court held it was error on the part of the trial court not to compel the witness to exhibit his arm to a jury in an attack upon his credibility on the ground he was currently a narcotic addict. *See also: People v. Perez* (1968), 92 Ill. App. 2d 366, 235 N. E. 2d 335.

Here, Higgins admitted the use of heroin and that fact could be taken into consideration by the jury in determin-

ing his credibility in general. The specific point in issue is the credibility of Higgins in stating he injected heroin in his arm about seventy-two hours before he testified and whether the statement can be impeached by requiring him to display his arm.

The degree and manner of cross-examination in criminal cases are matters within the discretion of the trial court. *Hedger v. State* (1911), 144 Wis. 279, 296, 128 N. W. 80; *O'Connor v. State* (1966), 31 Wis. 2d 684, 689, 143 N. W. 2d 489. Here, the evidence of recent use of heroin was sought to impeach Higgins. This request for a display of the arm was in the nature of a discovery of evidence in the presence of the jury. The trial court stated such a discovery might be required before an expert who could judge the recentness of needle marks from the use of narcotics. But such a discovery, when permitted, should be outside the presence of the jury in the first instance. The probative value of the display of Higgins' arm depended primarily on the ability of the jury by common knowledge to judge the recentness of needle marks. The case of *People v. Lewis, supra,* is not controlling or persuasive on these facts. There, the jury had only to determine whether there was a needle mark on the witness' arm, not whether it was inflicted within twenty-four or forty-eight hours.

In *Whitty v. State* (1967), 34 Wis. 2d 278, 294, 149 N. W. 2d 557, this court adopted Rule 303 of the Model Code of Evidence, which provides, in part, "The judge may in his discretion exclude evidence if he finds that its probative value is outweighed by the risk that its admission will . . . create substantial danger of undue prejudice or of confusing the issues or of misleading the jury . . . ." This rule is not restricted to evidence relating to the issue of guilt or against the accused; but the rule has been applied to all witnesses. *See: Lisowski v. Chenenoff* (1968), 37 Wis. 2d 610, 626, 155 N. W. 2d 619; *Olson v. Hardware Dealers Mut. Fire Ins. Co.*

(1970), 45 Wis. 2d 569, 173 N. W. 2d 599. We think the trial court was correct in its ruling that exhibiting the arm of Higgins to display a needle mark which he admitted was about seventy-two hours old would be unduly prejudicial when weighed against the probative value of what the evidence might show.

Edwards and Hill attempted to qualify Detective Thelen as an expert competent to pass judgment upon the freshness of needle marks made by the injection of heroin. The trial court refused to require Higgins to expose his arm for inspection by Detective Thelen. While Detective Thelen has considerable experience on the vice squad in Milwaukee and his testimony has appeared in appeal cases in this court, *see Jackson v. State* (1965), 29 Wis. 2d 225, 227, 138 N. W. 2d 260; *Blackwell v. State* (1969), 42 Wis. 2d 615, 619, 167 N. W. 2d 587, the evidence falls short of proving Thelen is qualified to judge with accuracy from observance of needle marks on a person's arm whether the person was under the influence of a narcotic. If a needle mark left a blood mark, it would be of some indication. Other discoloration or a scab might also be telltale but to translate such indications in terms of precise time requires expert judgment. We agree Detective Thelen was not so qualified in the record.

Edwards, on his appeal, argues that it was error for the court to limit Detective Thelen's testimony regarding Higgins' reputation for truth and veracity. A witness' testimony may be impeached by evidence of his reputation for veracity and truthfulness in his community. *State v. Baker* (1962), 16 Wis. 2d 364, 114 N. W. 2d 426; 58 Am. Jur., *Witnesses,* p. 391, sec. 725. This type of impeachment is generally accomplished by the testimony of another witness who knows the reputation the witness has in the community, but impeachment may not be the private opinion of the testifying witness. *State v. Sabala* (1966), 32 Wis. 2d 95, 145 N. W. 2d 95. In the one case the witness is testifying from knowledge to an objective

fact, in the other he is giving his own opinion of a witness' veracity. A reputation consists of much more than one person's opinion.

The record discloses that Thelen could not testify as to Higgins' reputation for truth and veracity in the community. The most he could testify to was that he knew 12 people who knew Higgins, but each had a varying opinion of Higgins. Thelen's knowledge of Higgins' reputation for truthfulness in the community was restricted and based upon the varying opinions of 12 people. This basis does not satisfy the test of a reputation in a community. We do not imply that the basis of a reputation must be more than 12 unanimous opinions. Many people are not well enough known to have a reputation, good or bad, in their community. In a large community, one does not need to be known by all or can he be known by all. But the basis of reputation must be broad enough to be accurate and constitute a reasonable consensus or popular opinion. Edwards argues the numerous objections to the cross-examination of Thelen confused him in his testimony. We find no merit in this argument.

Edwards' defense rested on the proposition he merely sought to collect the money Higgins owed and promised to pay him. The trial court instructed the jury that as a matter of law an indebtedness is not a defense to a charge of attempted robbery.

The question of whether the intent to collect a debt at gunpoint negates the necessary intent to steal and thus is a defense to a charge of robbery has never been decided in Wisconsin. Other jurisdictions are split as to the validity of the defense. The general rule as stated in an A. L. R. annotation [1] is that a charge of robbery will

---

[1] *Robbery—Intent to Collect Debt,* 46 A. L. R. 2d 1227, 1228, citing as cases in support of the rule: *Bauer v. State* (1935), 45 Ariz. 358, 43 Pac. 2d 203; see *People v. Sheasbey* (1927), 82 Cal. App. 459, 255 Pac. 836; *People v. Gallegos* (1954), 130 Colo. 232, 274 Pac. 2d 608, 46 A. L. R. 2d 1224; *State v. Hollyway* (1875),

fail where the money or property was taken at gunpoint with an intent to collect or secure payment of the debt, or, as the rule is sometimes stated, if the taker in good faith believes he owns or is entitled to the possession of the property, 77 C. J. S., *Robbery*, p. 464, sec. 22. This rule is based on the theory that an *animus furandi* (intent to steal) does not exist when a person takes property under the belief he has a bona fide claim to it. It is this belief, whether valid or not, that the majority of jurisdictions hold is inconsistent with an intent to steal. 46 Am. Jur., *Robbery*, p. 145, sec. 13. The rule is limited, however, in some jurisdictions and does not apply to the forcible taking of property for the purpose of collecting uncertain unliquidated damages or more than the amount of the debt. 2 Wharton's, Anderson, *Criminal Law and Procedure*, pp. 250, 251, sec. 550. The few cases to the contrary, of which the most persuasive is *Moyers v. State* (1938), 186 Ga. 446, 197 S. E. 846, deny the defense on the ground of public policy. This view is followed in *People v. Uselding* (1969), 107 Ill. App. 2d 305, 247 N. E. 2d 35, and in *Frazier v. State* (1961), 170 Tex. Crim. 432, 342 S. W. 2d 115.

While it is true a person ought not be encouraged to take the law in his own hands to collect a debt by gunpoint or by intimidation, we do not think that is the issue. The question is what is the nature of the specific intent necessary to establish the crime of robbery. In this state by sec. 943.32, Stats., and at common law, the intent must be to steal. If a person seeks to repossess

41 Iowa 200, 20 Am. Rep. 586; *Lanter v. Commonwealth* (1937), 268 Ky. 53, 103 S. W. 2d 693 (apparently a prosecution for assault with intent to rob); *State v. Brown* (1891), 104 Mo. 365, 16 S. W. 406; *State v. Culpepper* (1922), 293 Mo. 249, 238 S. W. 801; *State v. Carmans* (Ohio, 1816) Tappan 65 (97); *see Tipton v. State* (1923), 23 Okla. Crim. 86, 212 Pac. 612, 31 A. L. R. 1074, infra, sec. 4; *see People v. Hughes* (1895), 11 Utah 100, 39 Pac. 492 (dictum recognizing rule); *Butts v. Commonwealth* (1926), 145 Va. 800, 133 S. E. 764.

himself of specific property which he owns and to which he has the present right of possession and the means he uses involves a gun or force, he might not have the intention to steal. While the reclamation of specific removable property at gunpoint by the owner may not be armed robbery, such self-help may and generally does constitute a lesser crime than robbery. Thus the deterrence of and punishment for such conduct required by public policy are satisfied. Therefore, we are not persuaded by the reasoning of the minority cases.

Neither can we accept the view of the majority cases which see no distinction between the reclaiming of one's own property by force and the taking of money by force from a debtor to repay a debt which is presently owing. We think the intent to steal is present when one at gunpoint or by force secures specific money which does not belong to him in order to apply it by such self-help to a debt owed to him. In sec. 943.32, Stats., robbery is defined as whoever, with intent to steal, takes property from the person or presence of the owner by either force or threat thereof with intent to overcome his physical resistance. Theft in sec. 943.20 is defined as the intentionally taking and carrying away movable property of another without his consent and with intent to deprive the owner permanently of possession of such property. Unless the accused can trace his ownership to specific coins and bills in the possession of the debtor, the debtor is the owner of the money in his pocket and it is theft to take it from his possession with intention to permanently deprive him of its possession regardless of what other motive or intention the accused has.

The distinction between specific personal property and money in general is important. A debtor can owe another $150 but the $150 in the debtor's pocket is not the specific property of the creditor. One has the intention to steal when he takes money from another's possession against the possessor's consent even though he also in-

tends to apply the stolen money to a debt. The efficacy of self-help by force to enforce a bona fide claim for money does not negate the intent to commit robbery. Can one break into a bank and take money so long as he does not take more than the balance in his savings or checking account? Under the majority rule the accused must make change to be sure he collects no more than the amount he believes is due him on the debt. A debt is a relationship and in respect to money seldom finds itself embedded in specific coins and currency of the realm. Consequently, taking money from a debtor by force to pay a debt is robbery. The creditor has no such right of appropriation and allocation.

Neither Higgins' nor Edwards' view of the facts suggests an attempt to get specific money, the ownership title to which was in Edwards, and thus the crime of attempted robbery was committed. The trial court was correct in instructing the jury that the existence of a debt was not a defense to the charge of attempted armed robbery.

*By the Court.*—Judgments and order affirmed.