## STATE OF CONNECTICUT *v.* JOHN WILLIN

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

Argued January 11—decision released April 3, 1979

*Thomas D. Clifford,* with whom was *Robert L. Wyld,* for the appellant (defendant).

*Bernard D. Gaffney,* assistant state's attorney, with whom, on the brief, was *George D. Stoughton,* state's attorney, for the appellee (state).

BOGDANSKI, J. The defendant was tried before a jury and found guilty of assault in the third degree in violation of § 53a-61 (a) (1) of the General Statutes. From the judgment entered on the verdict, the defendant has appealed to this court.

From the evidence introduced at trial the jury could reasonably have found the following facts: On October 28, 1975, Michael Jordan, age thirteen, took part in a pony league football practice at Mill Pond Park which is next to the town hall in Newington. At about 8 p.m. when the practice session ended, Michael started for home on his bicycle. He rode the length of the parking lot adjoining the town hall to a path leading to a footbridge which runs parallel to Cedar Street. As he reached the path he heard footsteps behind him and, looking back, he saw a man wearing a purple jacket and a white rag or towel around his neck running towards him. At that point the man was about twenty-five feet away. As Michael reached the footbridge, he was grabbed from behind and pulled off his bicycle by the man who said "Don't worry. I won't hurt you." The man then dragged Michael about eight feet towards a bushy, wooded area. Michael, however, put up a struggle and was able to break free from his attacker.

Michael then turned and ran back to Mill Pond Park where he told Thomas Bascetta, Jr., his football coach, and Robert J. Seiler, a police officer on duty in the area, what had happened. He described his assailant, including the man's height and hair color. He also stated that he last saw the man running in a westerly direction across the footbridge towards Willard Avenue. Officer Seiler radioed this information to the police dispatcher. Sergeant William J. Cotter, who was at police headquarters, immediately drove his cruiser to Willard Avenue, where he observed a man wearing a dark jacket and what appeared to be a white towel around his neck jogging in a southerly direction along the east side of the street. When Sergeant Cotter first saw the

suspect, not more than two or three minutes had elapsed from the time of the report of the incident on the police radio. Sergeant Cotter was then joined by Officer Seiler, who took the suspect by police cruiser to the town hall parking lot.

At the parking lot, Michael Jordan, from a distance of two or three feet, made a positive identification of the defendant as he was sitting alone in the back seat of the police cruiser with the interior light of the vehicle on. The identification was made within eight to ten minutes of the assault.

Before the identification, Thomas Bascetta, Michael's football coach, who was also an off-duty police officer, told Michael that the police had someone that they wanted Michael to look at. At first Michael, who was very upset, was afraid to look into the police cruiser but Bascetta told him he need not be afraid because "this guy won't know you from Adam." Bascetta also cautioned Michael to take his time and to be sure before making an identification.

A pretrial hearing was held on the admissibility of the above identification. At the hearing, Michael testified that as he broke away from his assailant, he looked directly at the man, who was facing him at a distance of about six to eight feet; that it was a clear night; that there were street lights on Cedar Street as well as lights in the town hall parking lot and that he had no difficulty in seeing the man. He also made a positive in-court identification of the defendant who was seated at counsel's table. At trial, substantially the same evidence as to the out-of-court identification was introduced, and the witness once again made a positive in-court identification of the defendant.

On appeal the defendant claims that the admission of the out-of-court identification was violative of his due process rights; that the court applied an erroneous standard in determining the admissibility of that evidence; that the in-court identification was fatally tainted by the out-of-court identification; and that the court erred in charging the jury concerning the evaluation of the identification evidence in the case.

The defendant contends that the identification procedure used by the state, a one-on-one confrontation between victim and suspect, was impermissibly and unnecessarily suggestive, and that the identification itself, based on the totality of the circumstances, was unreliable.

We note first that a determination of whether there was a violation of due process rights in an identification procedure "depends on the totality of the circumstances surrounding it." *Stovall* v. *Denno,* 388 U.S. 293, 302, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967). In the recent case of *State* v. *Middleton,* 170 Conn. 601, 368 A.2d 66 (1976), this court observed (p. 608) that "[w]ithout question, almost any one-to-one confrontation between a victim of crime and a person whom the police present to him as a suspect must convey the message that the police have reason to believe him guilty. . . . On the other hand, we must also consider that prompt on-the-scene confrontations tend under some circumstances to ensure accuracy. . . . *Bates* v. *United States,* 405 F.2d 1104, 1106 (D.C. Cir.). . . . [and that] the benefits of promptness not only aid reliability but permit a quick release of an innocent party if there is no positive identification and allow the

police to resume the investigation with a minimum of delay. *Washington* v. *United States,* 334 A.2d 185 (D.C. App.)."

We note that the "show-up" in the present case involved a prompt on-the-scene confrontation and that at eight o'clock in the evening there would necessarily have been a long delay in summoning counsel and setting up a formal lineup. *Russell* v. *United States,* 408 F.2d 1280 (D.C. Cir. 1969). Under these circumstances we cannot conclude that the trial court erred in finding that the identification procedure used by the state was not *unnecessarily* suggestive.

It is, moreover, well settled that even impermissibly suggestive pretrial confrontations need not necessarily be excluded from evidence. In *Neil* v. *Biggers,* 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), the United States Supreme Court expressly declined to adopt a per se exclusionary rule as regards "unnecessarily suggestive" identification, procedures, holding instead that the admissibility of such evidence should be determined by "the totality of the circumstances." The court in *Biggers* emphasized that the central question in such situations is "whether . . . the identification was reliable even though the confrontation procedure [used] was suggestive." Id., 199.

In *Manson* v. *Brathwaite,* 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), the Supreme Court reaffirmed the holding of *Biggers* and emphasized once again that "reliability is the linchpin in determining the admissibility of identification testimony . . . . The factors to be considered [in determining reliability] are set out in *Biggers,* 409 U.S. at 199–200 [93 S. Ct. 375, 34 L. Ed. 2d 401 (1972)].

These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson* v. *Brathwaite,* supra, 114.

In the present case, the witness Michael Jordan testified that when he heard footsteps behind him, he looked back and saw a man wearing a purple jacket and what appeared to be a white rag or towel around his neck. He testified that it was a clear night; that there were street lights on Cedar Street as well as lights in the town parking lot, and that he had no difficulty in seeing his attacker after he managed to break free, as the man was looking directly at him from only six to eight feet away. Sergeant Cotter testified that when he first saw the defendant on Willard Avenue, not more than two to three minutes after the alleged assault, the defendant matched the description given by the victim.[1] As previously noted, the length of time between the assault and the identification was minimal, being in all no more than ten minutes, and the witness was positive in his identification of the defendant, both at the parking lot following the assault and in court. There is, moreover, no evidence in the record that there were any joggers, other than the defendant, in the area at the time.

Having carefully reviewed the "totality of the circumstances" surrounding the out-of-court iden-

---

[1] Sergeant Cotter testified that the defendant, a white male with dark hair, was wearing a dark jacket and what appeared to be a white rag around his neck. Only under the strong artificial lights of the parking lot was it possible to determine the exact color of the defendant's jacket, which was maroon, or that "what appeared to be a white rag or towel around his neck" was in fact a light blue towel.

tification of the defendant by the witness Jordan, we conclude that the trial court did not err in refusing to suppress that evidence. As the United States Supreme Court stated in *Manson,* "[s]hort of [a very substantial likelihood of irreparable misidentification] such evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Manson* v. *Brathwaite,* supra, 116.

The defendant next claims that the court applied an erroneous standard in determining the admissibility of the out-of-court identification; that the standard employed by the court was the "independent source" standard, which is used for determining the admissibility of an in-court identification following an impermissibly suggestive prior identification rather than the *Biggers-Manson* standard, which requires that the reliability of an out-of-court identification be weighed against the suggestiveness of the procedure used. The claim is without merit, as an examination of the special finding[2] made by the

[2] The record reveals that upon the facts found the following conclusions were reached by the trial court.

"26. The witness Michael Jordan had a good and sufficient opportunity to view his assailant at the time of the assault.

"27. The witness Michael Jordan viewed his assailant at close range and in adequate lighting.

"28. The description of his attacker related by Jordan to police accurately corresponded with the defendant's appearance at the time.

"29. The length of time between the assault and the identification of the defendant by Michael Jordan was minimal, being in all no more than ten minutes.

"30. The witness Michael Jordan was positive in his identification of the defendant both at the parking lot following the occurrence and in court at the time of trial."

court in connection with the pretrial suppression hearing reveals that the trial court did, in fact, apply the correct *Biggers-Manson* standard in determining admissibility of the out-of-court identification.

The defendant's final claims of error are directed at the court's charge to the jury on the factors to be considered in evaluating the evidence concerning the identification of the defendant by the witness Jordan. The defendant argues that the court erred in failing to charge as requested and that the charge, as given, improperly focused upon the issue of whether the identification procedure used by the state was impermissibly suggestive, instead of upon the factors affecting the reliability of the identification itself, as set forth in *Biggers*.

Examination of the defendant's request to charge, which the court failed to give, reveals that the requested instruction contains no references whatever to the *Biggers* guidelines. To the contrary, the emphasis of the defendant's requested charge (as was true of the defendant's evidence at trial) was upon the suggestiveness of the identification procedure used by the state.

Section 249 of the 1963 Practice Book provides that this court "shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered." "The purpose of [requiring exceptions] is to alert the court to claims of error while there is still an opportunity for correction in order to avoid the 'economic waste and increased court congestion caused by unnecessary retrials.'" *Prystash* v. *Best Medium Publishing Co.*, 157 Conn.

507, 512, 254 A.2d 872 (1969); *State* v. *Yorczyk*, 167 Conn. 434, 437, 356 A.2d 169 (1974). To this end, § 249 expressly requires that "[c]ounsel taking [an] exception shall state distinctly the matter objected to and the ground of objection." While the defendant objected at trial to the court's charge, we find it difficult, if not impossible, to determine from the language of the exception[3] either the matter objected to or the precise ground of the objection.

We conclude, therefore, that the exception which the defendant attempted to take cannot be said to have fairly apprised the trial court of the error claimed, as required by § 249 of the Practice Book. Consequently, error cannot be predicated on this exception. *Prystash* v. *Best Medium Publishing Co.*, 157 Conn. 507, 512, 254 A.2d 872 (1969).

There is no error.

In this opinion LOISELLE and LONGO, Js., concurred.

COTTER, C. J. (concurring). I cannot agree with the conclusion of the majority that the identification procedure employed by the state in the present case was not unnecessarily suggestive.

---

[3] "Your Honor, I would take exception to your Honor's failure to charge in total, our first request to charge, even though one was lesser than the other, because it seems to me that it was very important for the jury to recognize that among the problems in the identification procedures which caused our Supreme Court to make the statement it did, as the circumstances not only that surrounded the identification initially, by the witness involved with the police, but also the circumstances with which the witness himself had the opportunity to make an identification, and the way in which your Honor left it, I had the feeling, would lead the jury to believe that if the identification were not effected by the — in any way by the police suggestions, it still is okay."

In *State* v. *Middleton,* 170 Conn. 601, 604–605, 368 A.2d 66, the defendant was arrested by police within one hour after a robbery had taken place at a liquor store on the basis of a description provided by the proprietor of the store. Immediately following his arrest, he was taken to the store which had been robbed and was escorted inside, in handcuffs, to be identified by the proprietor. Id., 606. On the basis of those facts, this court stated: " 'We have no doubt that the identification procedure used by the police in this case was inherently suggestive, and significantly so. Without question, almost any one-to-one confrontation between a victim of crime and a person whom the police present to him as a suspect must convey the message that the police have reason to believe him guilty. The psychological factors that have been so thoroughly discussed by scholars and judges create a real risk of misidentification in such circumstances.' *United States ex rel. Kirby* v. *Sturges,* 510 F.2d 397, 403 (7th Cir.)." *State* v. *Middleton,* supra, 607–608.

In my view, the identification procedure used in the present case was *at least* as suggestive as that which we criticized in *Middleton.* Although the defendant apparently was not, as in *Middleton,* wearing handcuffs at the time of the confrontation, he was shown to the victim while seated in the rear seat of a locked police cruiser behind a screen in the car where suspects usually are detained while being transported. Prior to viewing the accused, the victim was told by one police officer that the police had found someone who fit the description given; and, according to the victim's own testimony, one of his coaches "probably" told him that "they think they got him." In addition, the victim admitted under cross-examination at the pretrial identifica-

tion hearing that, before looking at the defendant, he already believed, based on what he had been told, that the person in the police cruiser was his assailant.

The procedure employed in the present case was, in view of the available facts, also *unnecessary* because there was no emergency or exigent circumstance justifying such a procedure. See *Stovall v. Denno*, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199.[1] The majority states that since the confrontation occurred at eight o'clock in the evening, "there would necessarily have been a long delay in summoning counsel and setting up a formal lineup." The defendant, who was not under arrest at the time, was not, however, entitled to counsel at a lineup prior to the onset of formal prosecutorial proceedings. *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S. Ct. 1877, 32 L. Ed. 2d 411; *State v. Middleton*, supra, 609–610. Moreover, since the identification took place in the parking lot adjacent to the town hall where the police department is located, the delay brought about by moving inside to conduct a formal lineup would appear to be minimal. As the United States Supreme Court has observed, "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall v. Denno*, supra, 302; *Manson v. Brathwaite*, 432 U.S. 98, 104, 97 S. Ct. 2243, 53 L. Ed. 2d 140.

---

[1] In *Stovall v. Denno*, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199, the accused was brought to a hospital where the victim's wife, also wounded in the assault, was a patient. The witness was the only person who could possibly exonerate the accused and no one knew how long she might live. Since the witness was unable to visit the police station for a lineup, the court considered the immediate hospital confrontation "imperative." Id., 302.

Although I would conclude that the identification procedure employed in the present case was unnecessarily suggestive, I nonetheless concur with the majority's conclusion that, under the "totality of the circumstances," the identification was reliable. *Neil* v. *Biggers,* 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401. Weighing the factors to be considered in determining reliability as set forth in *Biggers* against "the corrupting effect of the suggestive identification itself," I cannot say that under all the circumstances of this case there is "a very substantial likelihood of irreparable misidentification." *Manson* v. *Brathwaite,* supra, 114, 116. The unnecessarily suggestive procedure used in the present case, however, cannot be condoned since, under other circumstances, such actions will invariably lead to out-of-court identifications which are in fact unreliable.

In this concurring opinion, PETERS, J., concurred.