STATE OF CONNECTICUT *v.* MITCHELL GORDON

BOGDANSKI, C. J., PETERS, HEALEY, PARSKEY and ARMENTANO, Js.

Argued June 9—decision released August 18, 1981

*Maxwell Heiman,* with whom, on the brief, was *William J. Tracy, Jr.,* for the appellant (defendant).

*Carl Schuman,* assistant state's attorney, with whom, on the brief, were *Robert Beach, Jr.,* and *Bernard Gaffney,* assistant state's attorneys, for the appellee (state).

BOGDANSKI, C. J. The defendant was accused of the crime of sexual assault in the first degree in violation of § 53a-70 (a) (2)[1] of the General Statutes and of the crime of robbery in the first degree

---

[1] At the relevant times General Statutes § 53a-70 provided: "SEXUAL ASSAULT IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or (2) by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person."

in violation of § 53a-134 (a) (3)[2] of the General Statutes. A jury found him guilty as charged on the first count and guilty on the second count of the lesser included offense of robbery in the third degree in violation of § 53a-136 (a)[3] of the General Statutes. From the judgment rendered thereon, he has appealed.

The defendant contends that the trial court erred: (1) in ruling that sufficient evidence supported the jury's verdict; (2) in permitting the victim to testify to her prior identification of the defendant and to identify him in court; (3) in refusing to instruct the jury on larceny in the fourth degree as a lesser included offense within the second count; and (4) in giving three particular instructions to the jury.

The following evidence is relevant to our treatment of the issues: Around 8 a.m. on the morning of May 20, 1977, in a parking lot near Main Street, Glastonbury, an assailant grabbed the victim from behind and put a knife to her stomach. The victim wore eyeglasses. She tried to break free and caught a quick look at her assailant. At trial she testified that her quick look revealed a five foot four inch tall individual who wore a blue shirt and, over his face, an orange ski mask. While telling her that if she didn't keep quiet he would put a hole in her stomach, he kicked and pushed her towards a

---

[2] At the relevant times General Statutes § 53a-134 provided: "ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (3) uses or threatens the use of a dangerous instrument."

[3] "[General Statutes] Sec. 53a-136. ROBBERY IN THE THIRD DEGREE: CLASS D FELONY. (a) A person is guilty of robbery in the third degree when he commits robbery."

shadowy and dark abandoned greenhouse which had
no artificial lighting. Along the way, as she strug-
gled to free herself, she asked him if he wanted
money or sex or other things. He responded with
silence. Subsequently, he removed her glasses and
blindfolded her. As she entered the greenhouse
cellar she dropped her purse. Despite the blindfold,
she managed to see a little bit of what her assailant
looked like. At the trial she testified that she had
observed that he was a thin white male with brown,
wavy hair which extended an inch below his ears, a
pointy nose, high cheekbones, broad shoulders, a
blue shirt, dungarees and a belt with a heavy buckle.
She no longer saw his knife. When he noticed that
she could see him, he threatened to hit her unless
she covered her eyes. Thereafter she pressed her
hand tightly over the blindfold which covered her
eyes. She was afraid to look at him again and was
unable to see anything more. At times the assailant
was angry and abusive, at other times he was polite.
He removed her clothing and carefully folded it.
After the sexual assault, she pleaded with him to let
her alone. She then heard him start to run toward
the cellar hatchway. Although the blindfold had
slipped, she looked in the opposite direction as he
fled. Before he left the cellar, he shouted something
at her and said "your purse is in here if you want it
when you're done." He then ran outside. The entire
incident took eight to nine minutes, six of which
were spent in the greenhouse cellar. Sometime
later, the purse was found and she discovered that
a ten dollar bill was missing.

Within minutes of the attack, she reported the
incident to the police, who arrived almost immedi-
ately. They found the distraught victim, next door
to the greenhouse, at her doctor's home. She

described her assailant as a white male of average height with dark brown, wavy hair, wearing a blue shirt and dungarees. At that time, the police could not get any more details of the assailant's appearance from the victim.

The defendant, a sixteen year old white male, was seen within several blocks of the incident shortly after the description was broadcast. Two off-duty firemen, who heard the description broadcast, saw the defendant start to run when a police car went by. They chased him into a back yard where he sat against a fence, took out a notebook, and apparently began to write his homework. He cried continuously and pounded his fist on the ground repeatedly. Lieutenant Paul Gibbons arrived within minutes. When Gibbons told him to stand, the defendant rose and said, "I don't know why I touched her." Gibbons patted him down and felt a hard object in his pants pocket. In response to a request to hand it over, the defendant handed Gibbons a jackknife and a ten dollar bill and said he had stolen the money from her. Gibbons then formally arrested the defendant and took him to the victim's doctor's driveway.

Within twenty minutes of the attack, Officer James Thomas asked the victim if she would look at someone who had just been located in the area. From a distance of thirty feet, the victim looked at the defendant who was seated in the back seat of an unmarked police car. She declined to make an identification. Because the victim was upset, the police did not insist that she take a closer look at the defendant. At Thomas' suggestion, she agreed to go to the police station to look at the defendant through one-way glass in order to avoid a face-to-face confrontation. On the way to the station house,

Thomas discussed the mechanics of the one-way glass with the victim. At the station, the victim told the police that she had only seen a little of her assailant's face and she repeated her earlier description of the assailant, adding only that he was in his early twenties. Thomas then asked her to look into a room and to identify, if she could, the person in the room. Still crying and emotionally upset, within ninety minutes of the crime, she viewed the defendant being interviewed by Gibbons, a much older person. She noted that the defendant had dark brown, wavy hair which extended an inch below his ears, broad shoulders, and a pointy nose, and that except for his younger appearance his facial features generally resembled her assailant. She also noted that the dungarees and blue shirt looked the same and that the defendant wore a belt with an unusual buckle. She spent three or four minutes making the identification and emerged from the room 80 percent certain of its accuracy. She attributed her uncertainty to the limited view she had gotten of her assailant. Subsequently, she saw the defendant twice, each time for about two minutes during court proceedings approximately one month after the incident.

## I

The defendant moved for judgment of acquittal at the close of both the state's case and all the evidence, and also after the jury returned their verdict of guilty. The portions of the motions relevant to this appeal argued (1) that the state failed to prove beyond a reasonable doubt that the defendant was sane at the time of the crime and (2) that the evidence failed to support the jury's conclusion that the defendant committed a robbery.

The defendant asserts that the court erred in denying these motions. "We have repeatedly stated the test which this court employs to determine whether the evidence is sufficient to sustain a verdict: ' "[T]he issue is whether the jury could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt . . . ." ' *State* v. *Gaynor*, 182 Conn. 501, 503, 438 A.2d 749 (1980), quoting *State* v. *Festo*, 181 Conn. 254, 259, 435 A.2d 38 (1980); *State* v. *Nemeth*, 182 Conn. 403, 410, 438 A.2d 120 (1980); *State* v. *Saracino*, 178 Conn. 416, 419, 423 A.2d 102 (1979); *State* v. *Jackson*, 176 Conn. 257, 262, 407 A.2d 948 (1978). 'In ruling on such a motion, the evidence presented at the trial must be given a construction most favorable to sustaining the jury's verdict.' *State* v. *Jackson*, supra, 262; see *State* v. *Nemeth*, supra; *State* v. *Chetcuti*, 173 Conn. 165, 172, 377 A.2d 263 (1977). Each essential element of the crime charged must be established by proof beyond a reasonable doubt, ' "and although it is within the province of the jury to draw reasonable, logical inferences from the facts proven, they may not resort to speculation and conjecture." ' *State* v. *Gaynor*, supra, 503; *State* v. *Festo*, supra, 259." *State* v. *Stankowski*, 184 Conn. 121, 126, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981); see *State* v. *Smith*, 185 Conn. 63, 71, 441 A.2d 84 (1981).

## A

The defendant called several lay witnesses who testified to their observation of the defendant prior to and immediately after the incident. Both the

defendant and the state called expert witnesses who based their testimony on their examinations, examinations by others and tests performed both before and after the incident. All the expert witnesses agreed that the defendant suffered from a mental disease or defect. Witnesses called by the defendant testified that the defendant lacked a substantial capacity to conform his conduct to the requirements of the law. On cross-examination, John Haksteen, one of the experts called by the defendant, admitted that he had read a report of psychological tests given to the defendant before the assault and that these tests had indicated that the defendant was a bright, normal sixteen year old who had an unhappy home life, but that the report had not recommended psychiatric treatment. Haksteen also admitted that the American Psychiatric Association had not recognized the type of disorder which he asserted caused the defendant to lack a substantial capacity to conform to the requirements of the law. Haksteen also conceded that the defendant had planned the rape for several days and had studied the pattern of the victim's daily activities during that time. The expert witness called by the state concluded that although the defendant did not have complete control of himself, he did not lack a substantial capacity to conform his conduct to the requirements of the law.

The weight to be given both the opinion evidence of expert witnesses and the lay evidence of sanity is for the jury to determine. *State* v. *Smith,* supra, 73–74; *State* v. *Ontra,* 178 Conn. 480, 484, 423 A.2d 134 (1979). The evidence enabled the jury to conclude beyond a reasonable doubt that the defendant was sane at the time the crimes were committed.

## B

The defendant contends that no evidence connected the use of force or threats to use force with the taking of the money and that therefore we must reverse his conviction for robbery. "Without the purpose of '(1) [p]reventing or overcoming resistance to the taking of the property or the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny'; General Statutes § 53a-133; there can be no robbery . . . ."[4] *State* v. *Coston*, 182 Conn. 430, 435, 438 A.2d 701 (1980). To commit a robbery, under our statute, an offender must have such a purpose at the time, during the course of committing a larceny, when he uses or threatens the immediate use of physical force upon another person. An offender, however, may commit robbery although he does not use or threaten to use force at the precise time he takes the property if he uses or threatens to use physical force at some other time

---

[4] "[General Statues] Sec. 53a-133. ROBBERY DEFINED. A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

The Model Penal Code and Commentaries § 222.1, comment, p. 101 n.13 (1980), observes that unlike most of the states' statutes the use of the word "purpose" in our statute introduces a second specific intent element.

"[General Statutes] Sec. 53a-119. LARCENY DEFINED. A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner."

during the course of committing the larceny. An act may have more than one purpose and more than one effect. Thus a jury reasonably may find that acts which compelled a victim to engage in sexual intercourse also had the purpose of preventing the victim's resistance to the taking of her property.

The use of force and threats of physical force left the victim alone with the defendant in an abandoned cellar, partly naked, and thoroughly shaken. The defendant had told her that if she screamed, he would cut a hole in her stomach. He had subjected her to a fully consummated sexual assault. The intimidation surely contributed to the lack of resistance to the larceny. The evidence allowed the jury to conclude that the defendant intended his use and threats of force to prevent the victim from resisting the taking of her property. A use of force for such a purpose occurs in the course of committing a larceny if it induces in the victim a physical disability or a reasonable emotional response that causes her not to resist the taking of her property. A more substantial interval than the seconds or minutes that may have elapsed here between the time of the intimidation and of the taking would not preclude a jury from finding that the use or threat of force occurred in the course of a larceny. *Tipton* v. *State,* 23 Okla. Crim. 86, 96, 212 P. 612 (1923); 2 Wharton, Criminal Law and Procedure § 559; 77 C.J.S., Robbery § 16. Sufficient evidence supported the jury's verdict on the robbery count.

## II

The defendant contends that the denial of his motion to strike the testimony of the prior out-of-court identification of the defendant and the denial

of his motion to prevent any in-court identification of the defendant by the victim constitutes a deprivation of due process of law in violation of article first, §§ 8 and 9 of the constitution of Connecticut and the fourteenth amendment to the constitution of the United States.[5]

The "use of out-of-court police identification procedures may give rise to a claimed violation of due process of law if the conduct of the procedure in a given instance was 'unnecessarily suggestive and conducive to irreparable mistaken identification,' a claim whose adjudication, however, 'depends on the totality of the circumstances surrounding it.' *Stovall* v. *Denno,* 388 U.S. 293, 302, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 [1967]." *State* v. *Hafner,* 168 Conn. 230, 235, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975); see *State* v. *Packard,* 184 Conn. 258, 261–62, 439 A.2d 983 (1981); *State* v. *Johnson,* 183 Conn. 156, 159, 438

[5] "No person shall . . . be deprived of life, liberty or property without due process of law . . . ." Conn. Const., art. I § 8.

"No person shall be arrested, detained or punished, except in cases clearly warranted by law." Conn. Const., art. I § 9.

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law. . . ." U.S. Const., amend. XIV § 1.

"In the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut residents have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law." *Horton* v. *Meskill,* 172 Conn. 615, 641–42, 376 A.2d 359 (1977).

A.2d 855 (1981); *State v. Anderson,* 178 Conn. 287, 291, 422 A.2d 323 (1979); *State v. Willin,* 177 Conn. 248, 251, 413 A.2d 829 (1979); *State v. Harden,* 175 Conn. 315, 319 n.2, 398 A.2d 1169 (1978); *State v. Kinsey,* 173 Conn. 344, 346–47, 377 A.2d 1095 (1977).

"In determining whether indentification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the 'totality of the circumstances.' See *State v. Gold,* 180 Conn. 619, 656–58, 430 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980); *State v. Piskorski,* 177 Conn. 677, 741, 419 A.2d 866 (1979); *State v. Willin,* 177 Conn. 248, 251, 413 A.2d 829 (1979); *State v. Smith,* 165 Conn. 680, 684, 345 A.2d 41 (1974); see also *Manson v. Braithwaite,* 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972)." *State v. Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980); see *State v. Packard,* supra, 262; *State v. Anderson,* supra, 292; *State v. Willin,* supra, 252; *State v. Kinsey,* supra, 347.

Applying the *Theriault* test, we must determine first whether the identification procedure used by the police at the station house show-up was unnecessarily suggestive. "Although one man confrontations do not per se constitute a denial of due process; *Neil v. Biggers,* supra; *Simmons v. United States,* 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247

(1968); *Stovall* v. *Denno,* 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967); *State* v. *Middleton,* 170 Conn. 601, 606, 368 A.2d 66 (1976); *State* v. *Carnegie,* 158 Conn. 264, 269, 259 A.2d 628, cert. denied, 396 U.S. 992, 90 S. Ct. 488, 24 L. Ed. 2d 455 (1969); this court has stated that '[w]ithout question, almost any one-to-one confrontation between a victim of crime and a person whom the police present to him as a suspect must convey the message that the police have reason to believe him guilty . . . .' *State* v. *Middleton,* supra, 608, quoting with approval *United States ex rel. Kirby* v. *Sturges,* 510 F.2d 397, 403 (7th Cir. 1975); see *State* v. *Willin,* supra, 251." *State* v. *Theriault,* supra, 372. The circumstances of the station house show-up unnecessarily suggested to the victim that she should positively identify the defendant. The witness was told that the police had taken someone into custody near the crime scene. She was asked to look at him immediately. When she declined to identify him she was told she could avoid a face-to-face confrontation by viewing him through one-way glass. The defendant was the only one in the room who came close to fitting the very general description given by the witness. The procedure used by the police, in effect, indicated to the witness that they had seized her assailant and wanted her to confirm their conclusion.

Moreover, the circumstances surrounding the identification do not reveal a need for a one man show-up with its attendant suggestiveness. Although a suggestive procedure may be permitted if exigent circumstances compel its use; *Simmons* v. *United States,* supra, 384–85; this case presented no danger that the opportunity for an identification would be lost unless a speedy show-up was held.

See *Stovall* v. *Denno,* supra. The police did not need to determine quickly whether they were on the wrong trail. See *Simmons* v. *United States,* supra. The defendant was safely in custody and had already made incriminating statements. The victim was readily available. The arresting officer testified that, at the time he found the defendant, he had no doubt that he had found the assailant. The show-up took place within one and one-half hours of the incident, but did not take place at the scene of the crime or at the earliest opportunity. The state makes no claim that a lineup was impractical. We conclude therefore that the show-up in this case was unnecessarily suggestive. *State* v. *Theriault,* supra, 372–73.

Our determination that the pretrial show-up was unnecessarily suggestive does not end our inquiry into whether the victim's identification of the defendant at the show-up was admissible at trial. The second prong of the *Theriault* test is reliability. Because reliability is the "linchpin" in determining the admissibility of identification evidence; *State* v. *Piskorski,* supra, 742; we must consider whether the "totality of circumstances" render the identification unreliable. *State* v. *Packard,* supra, 265; *State* v. *Theriault,* supra, 373. The factors which determine the reliability of an identification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of her prior description of the criminal, the level of certainty demonstrated at the confrontation and the time between the crime and the confrontation. " 'Against these factors is to be weighed the corrupting effect of the suggestive identification itself.' *Manson* v. *Braithwaite,* supra, 114 (citing *Neil* v. *Biggers,* supra, 199–200)." *State*

v. *Piskorski,* supra; see *State* v. *Packard,* supra, 265–66; *State* v. *Johnson,* supra, 159; *State* v. *Theriault,* supra, 373–74; *State* v. *Anderson,* supra; *State* v. *Willin,* supra, 252–53.

A suggestive identification procedure may cause a witness to believe sincerely that she retains, from an earlier encounter, memories of descriptive details that she actually fixed in her mind at the identification procedure. Therefore, in determining whether, despite an unnecessarily suggestive procedure, an identification is reliable, the trial court's observation of witnesses carries less weight than in other fact finding contexts. Accordingly, we examine the legal question of reliability with exceptionally close scrutiny and defer less than we normally do to the related fact finding of the trial court.

We test the reliability of the out-of-court identification by the requisite factors. Opportunity to view: The witness had more than one opportunity to view her assailant, but never saw more than a glimpse of him. In the parking lot, where lighting conditions were excellent, she managed to turn once and look at him. He wore a knit ski mask over his face, however, and she saw only the mask, his shirt, and his height. Subsequently her eyeglasses were removed and she was blindfolded. After that, she managed only brief glimpses of her assailant from under the blindfold, all under shadowy and dark conditions. The witness' opportunity to view her assailant was extremely limited because of the ski mask, blindfold, poor lighting conditions, and the removal of her eyeglasses. Degree of attention: The witness' degree of attention was limited because she quickly became emotionally upset and

fearful during the assault. She was afraid to look at her assailant. Although the witness was physically close to her assailant throughout the incident, her degree of attention to an identification was limited. In fact, she took deliberate steps to avoid a view of her assailant. Accuracy of prior description: The witness gave a very general description of her assailant to the police. She described her assailant as a white male of average height with dark brown, wavy hair, wearing blue jeans and a blue shirt. When questioned by the police at the scene of the crime, she was not able to give a more detailed description. At the police station prior to the identification, she described her assailant as a man in his early twenties, wearing a blue shirt. She told the police that she only saw a little of her assailant's face. She did not expand upon her description until after the identification at the station house. Immediately after the identification she remarked that the defendant looked younger than her assailant. Only after studying the defendant's appearance at the show-up did she relate that the assailant was thin and had a pointy nose, high cheekbones, broad shoulders and a belt with a heavy buckle. Furthermore, only then did she specify that the assailant was five feet four inches tall, a height we judicially notice is well below the average stature for American males of the relevant age group.[6] Witness' level of certainty: The witness indicated she was 80 percent certain. Time between the crime and the confrontation: The identification procedure occurred

[6] See Vital and Health Statistics: Series 11; Data from the National Health Survey; Number 165, p. 44 (1977) (based on examination conducted between 1971 and 1974); see also Vital and Health Statistics: Series 11; Data from the National Health Survey; Number 211, p. 11 (1979) (based on examinations conducted between 1971 and 1974).

within an hour and a half of the crime. The totality of these circumstances does not support the reliability of the victim's station house identification of the defendant as her assailant. The corrupting effect of the suggestive identification procedure outweighed the few factors that favor finding the station house identification reliable. Therefore the admission of this out-of-court identification violated the defendant's constitutional rights to due process.

In addition to testing the in-court identification by the same indicia of reliability as the station house identification, we must determine whether the state met its burden of establishing by clear and convincing evidence; *State* v. *Harden,* supra, 319 n.2; that the victim based her in-court identification "upon disassociated observation independent of the defective pretrial procedure." *State* v. *Piskorski,* supra, 745; see *State* v. *Gold,* supra, 656–58. Some of the circumstances of the in-court identification differ from the station house identification. The in-court identification occurred more than twenty months after the attack; however, in court the victim was totally certain that the defendant was her assailant. We must also consider the corrupting effect of the suggestiveness inherent in the in-court identification procedure used. The procedure consisted of the following exchange between the prosecutor and the victim: "Q. Do you recognize the defendant sitting at the counsel table? A. Yes, I do. Q. And who is he? A. He is the person who assaulted me on May 20, 1977." A prosecutor who directs a witness' attention to one individual and identifies that individual as the defendant and then asks "Who is he?" suggests how the witness should respond. The victim's testimony that her in-court testimony was not based upon the unnecessarily

suggestive show-up or upon her two other confrontations with the defendant at pretrial proceedings is one additional relevant factor, but, in the light of all the other circumstances, it fails to satisfy the state's burden under *State* v. *Harden,* supra. We conclude, on the basis of our review of the totality of the circumstances, that the trial court erred in admitting the in-court identification.

The state urges that even if the trial court erred in admitting both the station house and the in-court identifications of the defendant by the victim, such error would be harmless because of other overwhelming evidence that the defendant was the assailant. "Ordinarily the burden of establishing that harm resulted from a trial court error rests on the appellant. *State* v. *Cooper,* 182 Conn. 207, 212, 438 A.2d 418 (1980); *State* v. *Ruth,* 181 Conn. 187, 197, 435 A.2d 3 (1980); *State* v. *Pepe,* 176 Conn. 75, 81, 405 A.2d 51 (1978). However, 'there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.' *Chapman* v. *California,* 386 U.S. 18, 23, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). If error touches a less basic constitutional right, we sometimes apply the 'harmless error' exception, but only sparingly, in a few, discrete circumstances. *State* v. *Zeko,* 177 Conn. 545, 558, 418 A.2d 917 (1979)." *State* v. *Truppi,* 182 Conn. 449, 465, 438 A.2d 713 (1980), cert. denied, 451 U.S. 941, 101 S. Ct. 2024, 68 L. Ed. 2d 329 (1981).

Thus we refuse to expand our harmless constitutional error doctrine to the discrete circumstances of unnecessarily suggestive and unreliable identifications, the admission of which significantly impairs

the truth finding function of the jury. See *State* v. *Truppi,* supra, 466. Were we to do so we would fail to correct negligent infractions of constitutional rights and tempt some public officials to overstep the law in their zeal to convict the guilty. Some would yield to such temptation. The devastating nature of both negligently and deliberately obtained, unreliable eyewitness identifications would inevitably lead to the conviction of innocent persons. Hence sound judicial policy requires reversal whenever the erroneous admission of an unnecessarily suggestive and unreliable identification has violated a defendant's constitutional rights. We reverse the defendant's conviction.

Even if we were to expand our harmless error rule we would not find the error before us to have been harmless. The evidence of the defendant's guilt is indeed overwhelming. Unchallenged overwhelming evidence of the defendant's guilt by itself, however, does not allow this court to hold that the unconstitutional erroneous admission of unreliable evidence is harmless. We could find this error harmless only if both the properly admitted evidence of guilt were so overwhelming and the prejudicial effect of the improper evidence were so insignificant by comparison that it was clear beyond a reasonable doubt that the improperly admitted evidence did not influence the jury. *Chapman* v. *California,* supra, 23–24; see *United States* v. *Henry,* 447 U.S. 264, 269 n.5, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980); *Parker* v. *Randolph,* 442 U.S. 62, 70–71, 99 S. Ct. 2132, 60 L. Ed. 2d 713 (1979) (4 judge plurality opinion of Rehnquist, J.). The dissent errs by attempting to measure the effect of the untainted evidence on the jury's decision. Instead "[t]he focus of appellate inquiry should be

on the character and quality of the tainted evidence as it relates to the untainted evidence." *Harrington* v. *California,* 395 U.S. 250, 256, 89 S. Ct. 1726, 23 L. Ed. 2d 284 (1969) (Brennan, J., dissenting).

In the present case the tainted evidence includes all the identifications of the defendant by the only eyewitness to the crime, the victim. Such identifications were of a uniquely damaging character. The victim insisted that she was totally certain that the defendant was her assailant. Under these circumstances we could not say beyond a reasonable doubt that the jury totally ignored or decisively rejected these plainly relevant identifications. The trial court's error, therefore, may have influenced the jury adversely to the defendant. Therefore, we could not say that the error was harmless; *Chapman* v. *California,* supra; and we would reverse the convictions even without adopting a per se rule.

Because other sufficient evidence supported the defendant's convictions, a new trial on the charges for which he was convicted and their included offenses will not constitute double jeopardy.[7]

---

[7] Because other sufficient evidence supported the defendant's convictions, we need not decide whether the double jeopardy clause prohibits a retrial if the exclusion of evidence improperly admitted at trial would make insufficient what had been sufficient evidence to support a verdict. Compare *Matter of M.L.H.,* 399 A.2d 556, 558–59 (D.C. 1979); *State* v. *Bannister,* 60 Hawaii 658, 660–61, 594 P.2d 133 (1979); *State* v. *Alexander,* 281 N.W.2d 349 (Minn. 1979); *Sloan* v. *State,* 584 S.W.2d 461 (Tenn. Crim. App. 1979) (no retrial allowed), with *United States* v. *Mandel,* 591 F.2d 1347, 1373–74 (4th Cir. 1979), cert. denied, 445 U.S. 961, 100 S. Ct. 1647, 64 L. Ed. 2d 236 (1980); *State* v. *Boone,* 284 Md. 1, 393 A.2d 1361 (1978); *State* v. *Wood,* 596 S.W.2d 394 (Mo. 1980); *State* v. *Verdine,* 290 Or. 553, 624 P.2d 580 (1981); *State* v. *Lamorie,* 610 P.2d 342 (Utah 1980) (retrial allowed). *Greene* v. *Massey,* 437 U.S. 19, 26 n.9, 98 S. Ct. 2151, 57 L. Ed. 2d 15 (1978), specifically left this question open.

*State* v. *Smith,* 185 Conn. 63, 79, 441 A.2d 84 (1981). We consider one of the defendant's remaining claims of error because it may arise upon a retrial.

### III

The court erred when it refused the defendant's request to instruct the jury that if they did not find the defendant guilty of some degree of robbery, they could consider finding him guilty of the lesser included offense of larceny in the fourth degree.

A defendant is entitled to an instruction on an included offense if, and only if, the following conditions are met: (1) an appropriate instruction is requested by either the state or the defendant; (2) it is not possible to commit the inclusive offense, in the manner described in the information or bill of particulars, without having first committed the included; (3) the evidence, introduced by either the state or the defendant, or by a combination of their proofs, justifies a conviction for the included offense[8]; and (4) the proof on the element or elements which differentiate the included offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant not guilty of the inclusive offense but guilty of the included. *State* v. *Smith,* supra, 76–79.[9]

The unresolved question posed by this claim of error asks whether the evidence of the defendant's use or threatened immediate use of physical force

[8] We disapprove of *State* v. *Tinsley,* 181 Conn. 388, 398–99, 435 A.2d 1002 (1980), cert. denied, 449 U.S. 1086, 101 S. Ct. 874, 66 L. Ed. 2d 811 (1981), insofar as it did not acknowledge that if the evidence supported a conviction for robbery it necessarily supported a conviction for larceny in the fourth degree.

[9] The test is stated more precisely above than it was in *State* v. *Smith,* 185 Conn. 63, 76–79, 441 A.2d 84 (1981).

upon the victim occurred in the course of committing a larceny and for the purpose of preventing her resistance to the taking of her property or compelling her to engage in other conduct which aided in the commission of the larceny. "We must answer in the affirmative if viewing the evidence in the light most favorable to the defendant; *People* v. *Shuman,* 37 N.Y.2d 302, 304, 333 N.E.2d 363 (1975); reasonable minds could differ upon the existence or nonexistence of the element that distinguishes the inclusive from the included offense. *State* v. *Morin,* 180 Conn. 599, 610–11, 430 A.2d 1297 (1980) (*Healey, J.,* dissenting). Otherwise the defendant would lose the right to have the jury pass upon every factual issue fairly presented by the evidence. *Stevenson* v. *United States,* 162 U.S. 313, 314, 16 S. Ct. 839, 40 L. Ed. 980 (1896)." *State* v. *Smith,* supra, 77–78.

On the basis of the evidence presented, a reasonable juror could have believed that the defendant formed a larcenous intent only after he ceased to use or threaten to use physical force or that the defendant used and threatened the immediate use of force exclusively for purposes other than those stated in the robbery statute. See *People* v. *Pack,* 34 Ill. App. 3d 894, 899, 341 N.E.2d 4 (1976).

There is error, the judgment is set aside and a new trial is ordered.

In this opinion PETERS and PARSKEY, Js., concurred.

ARMENTANO, J. (dissenting in part; concurring in part). I agree that the trial court's ruling to admit into evidence the victim's out-of-court and in-court identifications of the defendant was improper. The analysis, however, does not end there. If we are

" 'able to declare a belief that [the trial court's error] was harmless beyond a reasonable doubt'; *Chapman* v. *California,* 386 U.S. 18, 24 [,87 S. Ct. 824, 17 L. Ed. 2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967)]"; then a remand is not required and the defendant's conviction of sexual assault in the first degree may be upheld. *Gilbert* v. *California,* 388 U.S. 263, 268, 274, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (1967); *State* v. *Packard,* 184 Conn. 258, 269n, 439 A.2d 983 (1981); *State* v. *Sorbo,* 174 Conn. 253, 257, 386 A.2d 221 (1978); *State* v. *Oliver,* 161 Conn. 348, 357, 288 A.2d 81 (1971); see *Fahy* v. *Connecticut,* 375 U.S. 85, 86–87, 92–95, 84 S. Ct. 229, 11 L. Ed. 2d 171 (1963) (Harlan, J., with whom Clark, Stewart, and White, Js., joined, dissenting); see also *State* v. *Briggs,* 179 Conn. 328, 337, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980). I am able to declare such a belief.

An examination of the transcript of the proceedings below discloses overwhelming evidence of the defendant's guilt. The victim was sexually assaulted during her menstrual cycle by an assailant armed with a knife. Later, she discovered that a ten dollar bill was missing from her purse. The defendant was observed within a few blocks of the scene of the crime shortly after the assault. He matched the general description given by the victim and fled when he observed a police cruiser. When confronted by Lieutenant Paul Gibbons of the Glastonbury police department, the defendant was crying and pounding the ground and said: "I don't know why I touched her." As he handed a pocket knife and a ten dollar bill to Gibbons, he said: "I stole the money from her." The victim testified that the knife was similar to the one used by her assailant. Labor-

atory reports disclosed blood and seminal stains on the undergarments worn by the victim and the defendant. An examination of the victim's vaginal area revealed the presence of spermatocytes. In addition to these facts, which alone convince me that the trial court's error was harmless beyond a reasonable doubt, there is the testimony of the defendant's own witnesses.

At the trial the only real issue was the defendant's sanity at the time of the crime or the lack of it. See General Statutes § 53a-13. To support this defense, the defendant offered the testimony of a psychiatrist and of a psychologist. During the questioning of them at trial, both doctors testified that the defendant not only admitted to the assault and robbery, but also, that he had begun planning them three days prior to the actual commission of the crimes. This evidence was elicited from the defendant's own witnesses and not from court appointed doctors called by the state. Furthermore the record reveals that some of the incriminating testimony was made during direct and redirect examination of the witnesses and that the defendant's attorney did not object to similar testimony when elicited by the state on cross- and recross-examination. Finally, there was neither an instruction nor a request for an instruction that the jury consider the testimony given by the doctors only when deciding the question of the defendant's sanity at the time of the crime. For these reasons, the defendant's admissions, as related by his expert witnesses, were pertinent to the issue of the defendant's guilt as well as to his insanity defense. See Practice Book § 760 (formerly Practice Book, 1963, § 2171); 18 U.S.C. Rule 12.2(c); 18 U.S.C. § 4244; *United States* v. *Cassidy,* 571 F.2d 534, 537 (10th Cir.), cert. denied, 436 U.S. 951, 98 S. Ct.

2859, 56 L. Ed. 2d 793, reh. denied, 439 U.S. 884, 99 S. Ct. 229, 58 L. Ed. 2d 199 (1978); see also *United States* v. *Leonard,* 609 F.2d 1163, reh. denied, 617 F.2d 295 (5th Cir. 1980); *United States* v. *Bennett,* 460 F.2d 872, 878–81 (D.C. Cir. 1972).

The testimony pertaining to the identifications by the victim of the defendant is cumulative at best. Its improper admittance into evidence was harmless error beyond a reasonable doubt. Under the circumstances of this case, a new trial for the crime of sexual assault in the first degree is unwarranted.

I concur with the majority's resolution of the other issues raised in the appeal.

In this opinion HEALEY, J., concurred.