# IN THE COURT OF APPEALS OF IOWA

No. 17-0695
Filed August 15, 2018

**STATE OF IOWA,**
 Plaintiff-Appellee,

**vs.**

**ISAIAH T. BUCHANAN,**
 Defendant-Appellant.
_____

 Appeal from the Iowa District Court for Black Hawk County, Andrea J. Dryer, Judge.


 Isaiah Buchanan appeals from his convictions for robbery in the first degree, being a felon in possession of a firearm, and carrying weapons. **AFFIRMED.**


 Mark C. Smith, State Appellate Defender, and Melinda J. Nye, Assistant Appellate Defender, for appellant.

 Thomas J. Miller, Attorney General, and Zachary C. Miller, Assistant Attorney General, for appellee.


 Heard by Danilson, C.J., and Mullins and McDonald, JJ.

**DANILSON, Chief Judge.**

Isaiah Buchanan appeals from his convictions for first-degree robbery, in violation of Iowa Code section 711.2 (2016); being a felon in possession of a firearm, in violation of section 724.26(1); and carrying weapons, in violation of section 724.4(1). Buchanan asserts the district court erred in instructing the jury that a claim of right is not a defense to theft because he did not raise the defense. In the alternative, he maintains that if this court concludes the claim-of-right defense was implicated, his trial counsel was ineffective in failing to assert it affirmatively. Buchanan also contends the court erred in denying Buchanan's request to have three jurors removed for cause. Finally, he claims the district court erred in allowing the State to play the recordings of his jailhouse phone calls.

We are not convinced Buchanan has suffered any prejudice as a result of the claim-of-right jury instruction. He cannot establish his trial attorney breached an essential duty in failing to raise a claim-of-right defense; this ineffective-assistance-of-counsel claim thus fails. With respect to Buchanan's juror challenge, Buchanan must show that the result was a juror being seated who was not impartial, which Buchanan has not attempted to do. Finally, we find no prejudicial error in the admission of the recorded jail phone calls. We therefore affirm his convictions.

**I. Background Facts and Proceedings.**

On April 4, 2016, Isaiah Buchanan confronted Jose Galindo inside J's R&B Lounge (hereinafter J's) in Waterloo. Buchanan was carrying some sort of weapon, and when he left, he had Galindo's coat. Buchanan was charged in four

counts: robbery in the first degree, going armed with intent, being a felon in possession of a firearm, and carrying weapons.

During jury selection, Buchanan moved to strike jurors 60, 7 and 92 for cause, and the district court denied Buchanan's motions as to all three potential jurors. Buchanan utilized peremptory strikes to remove jurors 60 and 7, but juror 92 remained on the panel and served as a juror in Buchanan's trial.

In opening argument, defense counsel stated the evidence would show,

> Mr. Buchanan did ask Mr. Galindo for the money that he was owed. The evidence will show that Mr. Galindo turned out his pockets and said "I don't have any money but here, you can have my coat." He offered his coat. Whether that was security, collateral for what was still owed or whether he thought that constituted some sort of partial payment, I don't know. I don't know what his rationale was in doing so. But what the evidence will show is that the coat was not demanded from him. It was not taken from him. There was no theft involved. This was Mr. Galindo's voluntary act to try to buy himself more time on the debt that he owed.
>     The evidence will also show that Mr. Buchanan does have a past. As [prosecutor] Mr. Walz indicated, there is a stipulation. Mr. Buchanan will acknowledge that he has previously been convicted of a felony. That's his past. He has come to terms with that. He accepts that. He is not hiding from that. He is not running from that. He acknowledges it. But I believe that the evidence will also show that that is not a violent past. That he does not have a history of doing the kind of things that he has been accused of here. And we intend to present witnesses including Mr. Buchanan who will say as much.

At trial, Galindo testified he had known Buchanan since they were young. A few days before the interaction at J's, Buchanan pulled up in a vehicle in front of Galindo's house and Galindo saw Buchanan had a pistol in his lap, either a .38 or nine millimeter. Galindo stated, "I just told him to do what he had to do."

Then, on April 4, Galindo was at J's with a friend, Rob, and played a game of pool. Rob left and Galindo was sitting at the end of the bar having some drinks

and talking with the owner of the establishment, Jay Wilder. Galindo saw Buchanan enter J's and approach Galindo "waving a gun" at him—the same gun Galindo had seen a few days earlier. Galindo testified Buchanan pointed the gun at his face and "said that he wanted the money from my pockets. I told him no, and then he decided to take my jacket." Galindo stated the whole interaction lasted "a minute or less." Galindo stated he feared Buchanan was going to shoot him. Galindo testified he did not owe Buchanan money and had never borrowed money from Buchanan.

On cross-examination, Galindo acknowledged he did not tell police Buchanan had a gun when he pulled his car up to the residence. Galindo also testified as follows:

> Q. Is there another incident that occurred around that time where you claim that Mr. Buchanan came up to your truck with a bat or something like that? A. He approached my truck.
> Q. Were you in the truck? A. Yes. I was in the truck.
> Q. Why did he approach your truck? A. I got waved down to stop so I stopped. I was with a friend of mine. He was in the passenger side. And he came up to the truck and started accusing me of something that I had no—no idea what he was talking about, and we just took off.
> Q. So it had nothing to do with you owing Mr. Buchanan money? A. No, sir.
> Q. Was there an incident around that time where you went to a person's house to obtain some marijuana, and you saw Mr. Buchanan at that house? A. No, sir.
> Q. Was there a time that you went to someone's—around this time, around the April 4th time, that you went to someone's house to get a movie and saw Mr. Buchanan? A. I can't recollect that, sir.
> Q. Was there a time around this April 4th date that you actually sat down with Mr. Buchanan and smoked marijuana with Mr. Buchanan? A. Years ago.
> Q. You said that you don't recall the incident where you went over to the friend's house to go get movies; is that correct? A. That's correct, sir.
> . . . .

Q. You do recall though getting your deposition taken here at the courthouse on December 2, 2016? A. Yes, I remember that, sir.

. . . .

Q. So when you went to that friend's house to get a movie, was Mr. Buchanan there? A. He showed up after I did.

Q. Mr. Buchanan, did he in any way demand money or that he be repaid for a debt? A. He demanded money, but I did not owe him any money, and I told him I don't know what he was talking about.

Q. So you don't know anything about this debt that Mr. Buchanan claims that you owe? A. This debt—he wants—he wants to collect a debt from me that is not even about me. I don't even know about the debt that he wants—he wants to collect something that I have nothing to do with.

Q. So you do know something about this debt? A. Well, it was brought to my attention.

Wilder described that at about 7:30 p.m. on April 4, he was talking to Galindo at the end of the bar at J's when he saw Buchanan, who "had a gun" that looked like a nine millimeter. Wilder owned a nine millimeter so he was familiar with its appearance. He stated he also knew what a Taser looked like, and Buchanan was not holding a Taser. Wilder said he could not understand what Buchanan was saying to Galindo because the music was loud, but he heard Galindo say, "I don't have anything." Buchanan then searched Galindo's pockets while holding the gun against Galindo's stomach. Galindo then said to Buchanan, "You can have my coat." Wilder told Buchanan to "[g]et that thing out of here," and Buchanan left, "apologiz[ing] to Mr. Jay . . . [he] didn't mean no disrespect." Wilder called the police when Buchanan left.

Police arrived and were talking with Wilder when Buchanan called J's to ask if the police were there. Wilder said they were, and gave the phone to an officer, but Buchanan hung up. Investigator Brice Lippert retrieved the phone number from Wilder's call history, and phone records confirmed it was Buchanan's phone

number. Lippert attempted to telephone Buchanan several times. Buchanan insisted he had not been at J's and had nothing to talk to the officer about. Cell phone records indicate Buchanan traveled from Waterloo to Tennessee in the next several hours.

The bartender, Tina Ackerson, testified she saw Buchanan enter the bar "like he was agitated," approach Galindo, say something like "[j]ust give it up," and "finally he demanded [Galindo's] jacket and just pulled it off of him." She stated she saw Buchanan with a gun in his hand, "swinging it back and forth" but not pointing it at anyone. Ackerson described the gun as a nine millimeter semi-automatic. She acknowledged she selected someone other than Buchanan from a photo lineup.

The prosecution also submitted audio recordings of several telephone calls Buchanan made from jail. Buchanan objected to the State's introduction of recordings of Buchanan's jail phone calls because they were irrelevant and unduly prejudicial. The district court overruled his objection, concluding they were admissible as admissions by the defendant.

Buchanan testified he loaned Galindo $700 eight months before the incident at J's, expecting repayment of $1000. Over the next eight months, Galindo paid about $680 but then started to avoid or evade Buchanan. Buchanan stated he had seen Galindo a few days before April 4, when he drove by Galindo's residence and saw him outside. Buchanan testified:

> I see him. I pull up. I stopped. I waved him to the car like come here. He come. He get in the car with me. And I'm like I asked him what's up with my money? We've been playing games and this and that. So next thing you know, he tells me he didn't have no money but his lady was going to cash a check, and she be back in [fifteen]

minutes. So I told him I said—he said he was going to have some type of payment for me in [fifteen] minutes, so I told him I'm—just call me, you know what I'm saying? I gave him my new numbers because I changed my number again, and I told him to call me. And he had—he said he would, and I told him, I'm like—I tell him—I'm like, "Man, you can call me in an hour. Just get in touch with me." He didn't call me. I started calling his phone. He don't answer. I texted him. He don't answer.

He denied having a firearm at the time.

Buchanan testified that when he saw Galindo's truck outside of J's, he went in "to talk to him about my money." When he saw Galindo, Galindo had a "beer bottle in his hand and a pool stick leaning against the bar," so Buchanan pulled out a camouflage-colored stun gun "shaped like a gun" for self-protection. He testified,

> Well, when he stood up and—like as soon as I got close to him, he was like—well, like I told you, I had been calling him before prior to that day and the day before, and he wasn't answering the phone. So as soon as he—I was kind of agitated when I seen him at the bar. He was spending money and you owe me money, you know what I'm saying? So I come in. He says—he—he greets me, like what's going on . . . and I immediately say where my money at. I probably use a little more French, but I was calm and I say where my money at.

Buchanan stated Galindo respond, "I don't have any money" and showed Buchanan he had nothing in his pockets. Buchanan continued:

> I don't remember what exactly what was said after that, but next thing you know, he said, "Just—just take my coat." And I told him "I don't want your coat. I want my money." But he started taking his coat off, and he had his coat in his hand, and he said, "Just take my coat," and I snatched it out of his hand and throw it on the ground, like the cuff links was—I think it was—I'm facing—it is my right hand. It was in his right hand, and like one of the cuff links was still around his wrist, and I snatched it out of his hand, and he kind of stretched his hand out a little bit, and I threw it on the floor. I said, "I don't want your F-ing coat. I want my money." And I seen—I kinda seen like the tone in the bar kind of change, you know, like people was drunk and their attention was drawn to it right then when I threw the coat. I kind of raised my voice a little bit. I was really frustrated. So then that's when Mr.—Mr. Jay says "You can't do that here. You got to

go." And Joey [Galindo] like "Just take the coat. Just take the coat, and let me get you your money. Take the coat." And I apologize to Mr. Jay, and because I didn't mean no disrespect. I wasn't trying to cause no scene or anything like that. I was just trying to speak with Mr. G, you know what I'm saying, and I apologized and I left. I took the coat and left.

Clifton Sallis testified he was shooting pool at J's on April 4 and knows Galindo and Buchanan. Sallis saw Buchanan come into the bar and ask Galindo about money. Galindo said he didn't have the money but offered his coat to Buchanan until he could pay him. Sallis testified Buchanan did not threaten or act aggressively toward Galindo. Buchanan took the coat, apologized to the crowd and left the bar.

The jury was instructed that to convict Buchanan of robbery in the first degree, the State must prove all of the following:

> 1. On or about April 4, 2016, the defendant had the specific intent to commit a theft.
> 2. To carry out his intention or to assist him in escaping from the scene, with or without the stolen property, the defendant
> > A. committed an assault on Jose Galindo by intentionally pointing a firearm toward Jose Galindo or intentionally displaying a dangerous weapon in a threatening manner toward Jose Galindo
> or
> > B. threatened Jose Galindo with, or purposely put Jose Galindo in fear of, immediate serious injury.
> 3. The defendant was armed with a dangerous weapon.

Instruction 15 provided: "Theft is taking possession or control of property that belongs to another with the intent to permanently deprive that other person of the property."

Instruction 15A provided:

> No person who takes, obtains, disposes of, or otherwise uses or acquires property is guilty of theft by reason of such act if the person reasonably believes that the person has a right, privilege or

license to take, obtain, dispose of, or otherwise use or acquire the property, or if the person does in fact have such right, privilege, or license. However, this claim-of-right defense is not available to a person committing an offense involving a violent reclamation of property, such as a robbery.

Buchanan objected to this instruction, stating:

I understand the State's position that claim of right is not—is not available as a defense to a person with regard to robberies, or case law says robberies or burglaries or things of that nature.

As those cases are stated, it appears to me that the defense is not entitled to an instruction that says that they may raise claim of right as a defense. That's not, however, the same thing as saying that the State is entitled to an instruction saying it is not a defense. I do believe that under the circumstances, and since I'm aware of the status of the law, that I would not be able to argue to the jury that it is a claim that—that it is a defense to raise a claim of right. But since I'm already precluded from raising that argument at least with regard to the charge of robbery, I think it is confusing to the jury to have that in as an instruction, particularly since one of the—that that charge does have some lesser included offenses that aren't robbery.

. . . .

. . . [I]t just seems like we're getting a little far afield and potentially confusing the jury by advising them of certain things that I don't believe either party is going to raise in its closing argument. I'm certainly not intending to raise claim of right as a defense. I didn't assert it as an affirmative offense. I could potentially raise justification to somewhat, you know, as regard to the lesser included offense of assault, but as for specifically claim of right with regard to the element of committing a theft or intent to commit a theft, I'm aware that I can't raise that so I won't be arguing it. So again, I just think having that additional language in there is actually more likely to confuse the jury than not.

After additional argument by counsel, the court ruled:

Listening to counsel's arguments and as I've been thinking about this myself, including thinking about it out loud while I'm talking to you, there is a certain claim of right that's implicit in the defendant's version of events, whether it's specifically called a claim of right or not. Under the circumstances given the way that the jury could choose to view the evidence, I agree with your contention, Mr. Walz [the prosecutor], that—that someone could—could see that as an issue or have a question about that. Mr. Tang [defense counsel], I'm going to deny your exception to instruction number 15[A] for that reason.

Buchanan was convicted of first-degree robbery, being a felon in possession of a firearm, and carrying a firearm. Buchanan's motion for a new trial was denied. The court imposed a twenty-five-year indeterminate term on the robbery conviction, a five-year term on the felon-in-possession conviction, and a two-year term on the carrying weapons conviction. The sentences were to run concurrently.

Buchanan now appeals claiming error in the jury instructions given, the denial of his objections to potential jurors for cause, and the admission of recordings of his jailhouse phone calls.

**II. Scope and Standards of Review.**

"'[W]e review challenges to jury instructions for correction of errors at law.' Our review is to determine whether the challenged instruction accurately states the law and is supported by substantial evidence. Error in giving a particular instruction does not warrant reversal unless the error was prejudicial to the party." *State v. Spates*, 779 N.W.2d 770, 775 (Iowa 2010) (citation omitted).

Claims of ineffective assistance of counsel are reviewed de novo. *Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001). In order to prevail on a claim of ineffective assistance of counsel, a claimant must prove that counsel failed to perform an essential duty and prejudice resulted. *See id.* at 142. "Both elements must be proven by a preponderance of the evidence. However, both elements do not always need to be addressed. If the claim lacks prejudice, it can be decided on that ground alone without deciding whether the attorney performed deficiently." *Id.* (citations omitted).

"We review the district court's rulings on challenges to potential jurors for cause for abuse of discretion." *State v. Jonas*, 904 N.W.2d 566, 570 (Iowa 2017). "The district court is vested with broad discretion in such rulings." *Id.* "An abuse of discretion will only be found when a court acts on grounds clearly untenable or to an extent clearly unreasonable." *State v. Hopkins*, 860 N.W.2d 550, 553 (Iowa 2015) (citation omitted).

## III. Discussion.

*A. Jury instruction.* On appeal, Buchanan asserts it was error for the district court to instruct the jury that a "claim-of-right" is not a defense to robbery because he was not relying on the defense. He maintains, "The jury should have been free to conclude that if Buchanan was only seeking to talk to Galindo about the debt and had no intention of taking *anything* from him, the State had failed to prove he had the specific intent to commit a theft." He asserts the instruction deprived him of such a possibility.

"In a criminal case, the district court is required to instruct the jury as to the law applicable to all material issues in the case." *State v. Becker*, 818 N.W.2d 135, 141 (Iowa 2012), *overruled on other grounds by Alcala v. Marriot Int'l, Inc.*, 880 N.W.2d 699, 708 n.3 (Iowa 2016). "On review for correction of errors at law, we are to 'determine whether the challenged instruction accurately states the law and is supported by substantial evidence.'" *State v. Green*, 896 N.W.2d 770, 775 (Iowa 2017) (quoting *State v. Hanes*, 790 N.W.2d 545, 548 (Iowa 2010)). "Error in giving or refusing to give a particular instruction warrants reversal unless the record shows the absence of prejudice." *Becker*, 818 N.W.2d at 141 (quoting *State v. Marin*, 788 N.W.2d 833, 836 (Iowa 2010)); *see also* Iowa R. Civ. P. 1.924 (requiring

the district court to "instruct the jury as to the law applicable to all material issues in the case"); Iowa R. Crim. P. 2.19(5)(f) ("The rules relating to the instruction of juries in civil cases shall apply to the trial of criminal cases."). Prejudice occurs if the erroneous "instruction could reasonably have misled or misdirected the jury." *State v. Hoyman*, 863 N.W.2d 1, 7 (Iowa 2015).

Instruction 15A provided,

> No person who takes, obtains, disposes of, or otherwise uses or acquires property is guilty of theft by reason of such act if the person reasonably believes that the person has a right, privilege or license to take, obtain, dispose of, or otherwise use or acquire the property, or if the person does in fact have such right, privilege, or license. However, this claim-of-right defense is not available to a person committing an offense involving a violent reclamation of property, such as a robbery.

Prior to adoption of the Iowa Criminal Code, the Iowa Supreme Court held under the common law that a person seeking repayment of a debt owed to him does not have the felonious intent necessary to commit a robbery. *See State v. Hollyway*, 41 Iowa 200, 202-03 (1875). After the Iowa Criminal Code was adopted in 1976, this court found this "claim-of-right" defense was only available for a charge of theft as provided in section 714.4, which states:

> No person who takes, obtains, disposes of, or otherwise uses or acquires property, is guilty of theft by reason of such act if the person reasonably believes that the person has a right, privilege or license to do so, or if the person does in fact have such right, privilege or license.

*State v. Miller*, 622 N.W.2d 782, 785 (Iowa Ct. App. 2000).

The first sentence of Instruction 15A is a recitation of section 714.4 and Uniform Jury Instruction 1400.19. In *Miller*, we noted, "The explicit language of section 714.4 appears to confine the claim-of-right defense to theft charges." *Id.*

at 785 n.2. We also observed, "The modern trend among other states has been to decline a claim-of-right defense to offenses involving force, such as robbery or burglary."[1] *Id.* at 785. Moreover, we acknowledged public policy "evinces the modern distaste for violent self-help," lending support to our determination that the claim-of-right defense is not available to robbery and burglary charges. *Id.* at 785-86. We have applied the principle since.[2] The second sentence of Instruction 15A, thus, accurately states the law.

We next turn to whether the instruction is supported by substantial evidence. *See Green*, 896 N.W.2d at 775. Buchanan was charged with first-degree robbery. He asserts he did not raise the claim-of-right defense and the court erred in concluding the claim-of-right had been implicated. He asserts, "[T]he instruction had no relevance in this case."

Witnesses testified Buchanan, armed with a semiautomatic pistol, demanded money from Galindo, and then demanded Galindo's jacket. One

---

[1] One author has noted "the traditional rule" is that the specific intent to steal is negated even if a person uses force to retrieve property to which they claim a right of possession, but the "modern trend" is to reject the claim-of-right defense when force is used. Joshua Dressler, *Understanding Criminal Law* 557-58 (6th ed. 2012) (citing *Miller*).

[2] For example, in *State v. Moss*, No. 10-0079, 2010 WL 5050561, at *3 (Iowa Ct. App. Dec. 8, 2010), we ruled:

> Moss claims the $200 he was attempting to recover from Hughes does not provide a basis to support a robbery finding. He argues there was evidence from which a jury could find the debt was legitimate. However, the claim-of-right defense is unavailable against charges of burglary and robbery, which involve violent reclamation of property.

And, more recently in *State v. Mims*, No. 12-2279, 2014 WL 956065, at *1 (Iowa Ct. App. Mar. 12, 2014), we rejected a defendant's argument that the items he took from another "as a means to get his car back" did not support a burglary conviction, noting:

> [A] claim of right to property taken may not serve to negate intent to a charge of burglary. [*Miller*, 622 N.W.2d at 785] (concluding the claim-of-right defense provided in Iowa Code section 714.4 is only applicable to theft charges). Here, Mims lacked both a claim of right and a right to impose a condition before returning the property.

witness stated Buchanan forcefully pulled the jacket from Galindo. Buchanan testified Galindo owed him money and that he had no interest in Galindo's jacket, but Buchanan did not deny he took the jacket. We conclude this is sufficient evidence to support the giving of the instruction.

Buchanan argues the instruction *required* the jury to convict him of robbery "even if Buchanan only wanted to talk to Galindo about the debt and his avoidance of paying it." We disagree. The instruction references a person who "takes, obtains, disposes of, or otherwise uses or acquires property" and "violent reclamation." Simply talking about a debt fits none of these terms, all of which require the gaining of possession.

The instructions informed the jury that to find Buchanan guilty of robbery, they had to find he had "the specific intent to commit a theft." If the jury found only that Buchanan wanted to talk to Galindo about paying a debt owed, they could not find an intent to commit theft because theft was defined as "taking possession or control of property *that belongs to another* with the intent to permanently deprive that other person of the property." Nothing in the instruction necessitates a finding of robbery without a defendant taking or obtaining something from the other.

The State's case was based upon Buchanan taking the jacket at gunpoint from Galindo. Ackerson testified Buchanan grabbed the jacket from Galindo. Buchanan's testimony was that he demanded money owed to him and took Galindo's jacket because it was offered to him. It was for the jury to determine what Buchanan's intent was in taking Galindo's jacket.[3] *See State v. Tyler*, 867

---

[3] Buchanan filed a supplemental pro se brief in which he argues, in essence, instruction 15A deprived him of his ability to challenge the sufficiency of the evidence of his specific

N.W.2d 136, 193 (Iowa 2015) ("Intent, and therefore guilt or innocence, is for the jury to determine."); *cf. State v. Brighter*, 608 P.2d 855, 859 (Haw. 1980) (rejecting defendant's claim-of-right defense but concluding the trial court's instruction to the jury that a bona fide claim-of-right was not a defense to robbery "was at best harmless error."). Moreover, the jury was properly instructed on specific intent:

> "Specific intent" means not only being aware of doing an act and doing it voluntarily, but in addition, doing it with a specific purpose in mind.
> Because determining the defendant's specific intent requires you to decide what he was thinking when an act was done, it is seldom capable of direct proof. Therefore, you should consider the facts and circumstances surrounding the act to determine the defendant's specific intent. You may, but are not required to, conclude a person intends the natural results of his acts.

Instruction 14. We are not convinced Buchanan has suffered any prejudice as a result of the claim-of-right jury instruction.

We also note that in an analogous instance, our supreme court has concluded there was no merit to a defendant's claim it was error to instruct a jury on the defense of intoxication although the defendant had not raised the defense of intoxication. *State v. Jenkins*, 412 N.W.2d 174, 176-77 (Iowa 1987). The court concluded there was substantial evidence of the defendant's intoxication on the night in question, and "the court must instruct on all material issues so that the jury understands the matters which they are to decide." *Id.* at 177; *see also State v. Cortez*, No. 09-1362, 2010 WL 3894443, at *11 (Iowa Ct. App. Oct. 6, 2010) (affirming the district court where there was substantial evidence of intoxication,

---

intent to commit a theft because the court "co[r]relate[d] receiving or accepting a willing exchange of com[m]er[c]e with a[n] unwilling taking or a theft of co[m]mer[c]e with the claim of a [r]ight to do so."

and the district court submitted the instruction to help clarify the issues). Likewise, there is substantial evidence in our record related to a claim of right, and instruction 15A was more likely to reduce confusion on the part of the jury by instructing on a person's right or lack of right to reclaim property. Moreover, there is nothing in the record that reflects the jury became confused during deliberations.

*B. Ineffective assistance of counsel.* Buchanan asserts that if a claim-of-right was implicated, his trial counsel was ineffective in not raising an affirmative defense. We have previously rejected a claim that counsel breached a duty in not raising a claim-of-right defense. In *State v. Enochs*, No. 15-1118, 2016 WL 4384655, at *2-3 (Iowa Ct. App. Aug. 17, 2016), we observed:

> Given the status of Iowa law on the claim-of-right defense, competent counsel was not compelled to find the issue was worth raising—and in the process, forego a favorable plea offer from the State.
> Iowa recognizes a statutory claim-of-right defense in theft cases:
>> No person who takes, obtains, disposes of, or otherwise uses or acquires property, is guilty of theft by reason of such act if the person reasonably believes that the person has a right, privilege, or license to do so, or if the person does in fact have such right, privilege, or license.
> Iowa Code § 714.4.
> More than a decade ago, our court concluded that statute did not offer a defense to burglary or robbery charges:
>> The express terms of section 714.4 provide that it is only a defense to a theft charge. Burglary and robbery are not included. We may not—under the guise of statutory construction—enlarge or otherwise change the terms of a statute which require us to read something into the law that is not apparent from the words chosen by the legislature. We decline to legislate expansion of the defense.
> [*Miller*], 622 N.W.2d [at] 785 (citations omitted). We have followed *Miller* in the intervening years. *See, e.g.*, [*Mims*], 2014 WL 956065, at *1; *Greene v. State*, No. 09–0233, 2009 WL 3379100, at *3 (Iowa

Ct. App. Oct. 21, 2009); *Bucklin v. State*, No. 06–1942, 2008 WL 375219, at *3 (Iowa Ct. App. Feb. 13, 2008).

Because Buchanan cannot establish his trial attorney breached an essential duty in failing to raise a claim-of-right defense, his ineffective-assistance-of-counsel claim fails.[4]  *See Ledezma*, 626 N.W.2d at 142 (noting an ineffectiveness claim fails if either element is not proved)*.*

---

[4] This court is not alone in rejecting a claim-of-right defense to robbery and burglary.  For instance, in *State v. Hobbs*, 64 P.3d 1218, 1222-23 (Utah App. 2003), the Utah court cited our case with approval and observed:

> Many other jurisdictions have addressed this issue and determined that although the claim of right defense may be statutorily available for theft offenses, it is not available for robbery or burglary offenses.  For example, the Iowa Court of Appeals, considering an appeal of a burglary conviction, analyzed their robbery and burglary statutes to determine whether the claim of right defense was available for those crimes.  *See* [*Miller*], 622 N.W.2d [at] 785.  The court determined that although Iowa's claim of right defense statute expressly states its availability for a person "guilty of theft," defendants accused of robbery and burglary were not permitted to use the defense.  *Id.*  The *Miller* court stated that to permit another interpretation "would require us to read something into the law that is not apparent from the words chosen by the legislature."  *Id.*  The court went on to analyze the "modern trend . . . to decline to recognize the claim-of-right defense to offenses involving force, such as robbery or burglary."  *Id.*; *see also People v. Tufunga*, 987 P.2d 168, 177-78 (Cal. 1999) (outlining modern trend). The reasons for this conclusion are well-stated in *State v. Ortiz*, 305 A.2d 800 (N.J. Super. Ct. App. Div. 1973), where the court found the proposition that a claim of right negates the felonious intent of robbery lacks logic and "is utterly incompatible with and has no place in an ordered and orderly society such as ours, which eschews self-help through violence.  Adoption of the proposition would be but one step short of accepting lawless reprisal as an appropriate means of redressing grievances, real or fancied."  *Id.* at 802.
>
> We therefore hold that the claim of right defense is not available for the crime of robbery because the legislature specifically provided for the common law defense of claim of right only for theft charges.  The exclusion of the defense for robbery charges is evidence of the legislature's intent that it not be available for robbery.  Consequently, the trial court correctly refused to instruct the jury on the claim of right defense.

*See also Whitescarver v. State*, 962 P.2d 192, 195 (Alaska Ct. App. 1998) (stating "there is no 'claim of right' defense to robbery"); *State v. Schaefer*, 790 P.2d 281, 284 (Ariz. Ct. App. 1990) ("From a policy standpoint, the claim of right defense remains anachronistic: it encourages disputants to resolve disputes on the streets through violence instead of through the judicial system."); *Thomas v. State*, 584 So.2d 1022, 1026 (Fla. Dist. Ct. App. 1991) (holding "the common law [claim-of-right] rule . . . is not available to defeat charges

*C. Juror challenges.*  Iowa Rule of Criminal Procedure 2.18(5)(k) allows a party to challenge a prospective juror if the juror has "formed or expressed such an opinion as to the guilt or innocence of the defendant as would prevent the juror from rendering a true verdict upon the evidence submitted on the trial."  The test to be applied under the rule is "whether the juror holds such a fixed opinion on the merits of the case that he or she cannot judge impartially the guilt or innocence of the defendant."  *State v. Neuendorf*, 509 N.W.2d 743, 746 (Iowa 1993) (quoting *State v. Gavin*, 360 N.W.2d 817, 819 (Iowa 1985)).  The trial court is vested with broad discretion when ruling on a challenge for cause.  *State v. Tillman*, 514 N.W.2d 105, 107 (Iowa 1994).

In order to overcome the trial court's ruling, "the defendant must show (1) an error in the court's ruling on the challenge for cause; and (2) either (a) the challenged juror served on the jury, or (b) the remaining jury was biased as a result of the defendant's use of all of the peremptory challenges."  *Id.* at 108.  Where, as

---

of robbery for forcibly taking money to satisfy a debt owed by the victim to the taker"); *Westmoreland v. State*, 538 S.E.2d 119, 121 (Ga. Ct. App. 2000) ("To allow a 'claim of right' defense to an offense, such as robbery by sudden snatching, within which the use of force is implicit would sanction the use of force to claim the property."); *Brighter*, 608 P.2d at 859.

But see *State v. Smith*, 118 A.3d 49, 56 (Conn. 2015) ("The robbery statutes prohibit the use or threat of physical force *to commit a larceny.*  If a defendant had no intent to commit a larceny, we can perceive no reason why the legislature would have intended that the defendant still could be charged with robbery instead of being charged with other offenses, such as assault, unlawful restraint, threatening or reckless endangerment, that criminalize the use or threatened use of restraint or physical force, standing alone."); *see also Edwards v. State*, 181 N.W.2d 383, 387 (Wis. 1970) ("If a person seeks to repossess himself of specific property which he owns and to which he has the present right of possession and the means he uses involves a gun or force, he might not have the intention to steal.  While the reclamation of specific removable property at gun point by the owner may not be armed robbery, such self-help may and generally does constitute a lesser crime than robbery.")

See generally, 3 Wayne R. LaFave, *Substantive Criminal Law* § 20.3(b) (3d ed. Oct. 2017 update) and cases cited therein.

here, a challenged juror served on the jury, the defendant must show the jury was biased. *See Neuendorf*, 509 N.W.2d at 746 ("In the absence of some factual showing that this circumstance resulted in a juror being seated who was not impartial, the existence of prejudice is entirely speculative.").

Buchanan challenges the district court's denial of his objections for cause to three jurors. The jurors had initially indicated some knowledge of the case or a potential witness but all asserted they could judge the proceedings fairly, based on the instructions. Buchanan used peremptory challenges to strike two of the three jurors, but juror 92 served on the jury. He does not assert, however, the resulting jury was biased. Buchanan urges this court to presume prejudice and find that under Iowa Rule of Criminal Procedure 2.18(5) and (9), his having to use peremptory challenges to dismiss the jurors constitutes structural error and *Neuendorf* must be overruled.[5] This court addressed a similar challenge in *State v. Ventura*, No. 17-0661, 2018 WL 2084860 (Iowa Ct. App. May 2, 2018). There, we stated,

> Following *Neuendorf*, "[t]he search for legal prejudice must therefore focus on the potential for prejudice that flowed from forcing defendant to use a peremptory challenge on [the challenged juror] that might have been used to remove another juror." 509 N.W.2d at 746. It is up to the defendant to "make some factual showing that this circumstance resulted in a juror being seated who was not impartial." *Id.*
> While we are not at liberty to revisit precedent, our supreme court recently revisited *Neuendorf* in *State v. Jonas*, 904 N.W.2d 566,

---

[5] Buchanan argues,

> Forcing the defendant to utilize peremptory strikes to remove biased jurors unfairly tips the balance of the adversarial proceeding in favor of the State by limiting a defendant's ability to pick a jury it deems favorable on par with the State's ability to do so. Effectively decreasing the number of peremptory strikes available to the defense under these circumstances violates the spirit of rule 2.18(9).

583-84 (Iowa 2017). In *Jonas*, the court ruled that when the district court abuses its discretion by improperly refusing "to disqualify a potential juror under Iowa Rule of Criminal Procedure 2.18(5)(k) and thereby causes a defendant to expend a peremptory challenge under rule 2.18(9), the defendant must specifically ask the court for an additional strike of a particular juror after his peremptory challenges have been exhausted." 904 N.W.2d at 583. When the defendant does so, "prejudice will then be presumed." *Id.* However, "where a judge improperly denies a challenge for cause but the defendant does not specifically ask for an additional peremptory challenge of a particular juror after exhausting his peremptory challenges," *Neuendorf* remains good law. *Id.*

*Ventura*, 2018 WL 2084860, at *1.

Even assuming the district court erred in denying Buchanan's challenge for cause to Juror 92, he did not ask for an additional preemptory challenge. Thus, Buchanan must make some factual showing that the result was a juror being seated who was not impartial; that is, Buchanan must show actual prejudice.[6] *See Jonas*, 904 N.W.2d at 584. He has not attempted to do so. We therefore reject his claim.

*D. Jailhouse telephone recordings.* At trial, Buchanan objected to recordings of his telephone calls made from jail to his girlfriend and to the mother of his children on the grounds they were of little or no relevance and would be unfairly prejudicial. Counsel asserted the "content of those calls is not probative of any element of any offense charged or of any defense" raised. The prosecutor described the substance of the recordings as follows:

---

[6] As we observed in *Ventura*, "We are unconcerned that *Jonas* was decided after [Buchanan's] trial but before [th]is appeal, as we apply the same test in either situation." 2018 WL 2084860, at *2 n.1. Before *Jonas*, Buchanan had the burden to establish that his jury was not impartial to create a presumption of prejudice under *Neuendorf*. After *Jonas*, because Buchanan did not request the additional peremptory strike, we still apply the actual prejudice test of *Neuendorf*.

> The jail phone calls would be along the lines of [Buchanan] talking about Jose Galindo not testifying and him needing not to show up for depo[sition]s. They also involve him trying to set up an alibi defense with a mother of one of his children and what to say and how—and where he was and regarding statements about Tre [Clifton Sallis] being there and not, and we do believe that him talking about what witnesses need to do and what—and setting up an alibi defense and obviously through the defense's opening statements would appear to be inconsistent with anything that the defendant's going to say. But also just regardless of what the defense said in their opening statement setting up an alibi defense that is inconsistent with the evidence we do believe is relevant as far as the defendant's culpability in this case.

The trial court overruled the objections and allowed the statements "as admissions by the defendant."

If relevant, the district court can properly admit Buchanan's statements on the audio recordings. *See* Iowa R. Evid. 5.801(d)(2)(A); *State v. Odem*, 322 N.W.2d 43, 47 (Iowa 1982) ("It is basic that a party may place into evidence the admissions of a party-opponent."). Therefore, we must determine if the proposed evidence was relevant and, if so, whether the probative value of the evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Iowa R. Evid. 5.403; *State v. Neiderbach*, 837 N.W.2d 180, 202 (Iowa 2013) (noting we apply a two-part test to determine whether evidence should be excluded under rule 5.403). Evidence is unfairly prejudicial when it "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case." *Neiderbach*, 837 N.W.2d at 202 (citation omitted).

The State argues the phone conversations were relevant to Buchanan's guilty conscience and undercut his credibility. The State also maintains that even if the district court abused its discretion in admitting the phone calls, Buchanan suffered no prejudice from the parts of the phone calls concerning his working on an alibi defense and Galindo's presence at a deposition because much of the evidence was already in the record. Officer Lippert testified Buchanan claimed not to have been at J's at the time of the incident, and Jay Wilder testified Buchanan called the bar and told him to say he had not been there and Galindo would get his coat back. Galindo testified about attending his deposition.

Buchanan's presence at J's was not in issue after defense counsel acknowledged in opening statements that Buchanan was present. We acknowledge Buchanan did not raise an alibi defense, but efforts to contrive an alibi defense, or avoid conviction by Galindo failing to appear are relevant to consciousness of guilt. We agree the phone conversations on these topics were prejudicial to Buchanan but we are unable to conclude such evidence is unfairly prejudicial. *See id.*

On appeal, Buchanan also asserts that "half of the content of the recordings are hearsay statements of the women on the other line." He acknowledges his trial counsel did not seek to redact any of the recordings played, and thus, his challenge must be addressed as a claim of ineffective assistance of counsel. Consequently, Buchanan must establish by a preponderance of the evidence that (1) counsel breached an essential duty in failing to assert these hearsay objections, and (2) the result of the trial would probably be different had the objection been made. *See State v. Enderle*, 745 N.W.2d 438, 440 (Iowa 2007).

"If a defendant does not show prejudice, the case can be decided on that issue alone without the additional inquiry into whether counsel's performance was deficient." *Id.*

We first address the claim of ineffective assistance of counsel for failure to seek a redaction of the claimed inadmissible or unfairly prejudicial evidence. Buchanan objected to the audio evidence as being unduly prejudicial. If the objection had been sustained none of the recordings would have been admitted unless the State agreed, or the court ordered the offending portions deemed unfairly prejudicial to be redacted. Defense counsel is not ineffective for failing to seek redaction when counsel has made a proper objection to exclude all of the same evidence. Instead, it would have been incumbent upon the State to seek redaction of the offending portions in an effort to admit the remaining portions of the audio. Thus, we conclude counsel is not ineffective for failing to seek a redaction of a portion of an exhibit when counsel has made the same objection to the entirety of the exhibit.

With respect to the women's portions of the conversations, Buchanan asserts "the most problematic aspect of the calls are the discussions in which [the mother of his children] Jada Mills encourages Buchanan to make a plea deal rather than take the case to trial."[7] During that call, Buchanan alleges Mills accuses Buchanan of lying and repeating that other people have told her he was "caught in

---

[7] Notwithstanding much effort, the recordings were only barely audible and, in some recordings, only the recipient of the call can be heard. It is not the court's responsibility to assure the adequacy of the record relied upon by the parties. Moreover, we have no way of knowing how well the jury could hear the recordings. Finally, no transcripts of the recordings were admitted or made part of the record.

a lie," and discusses how he will go to prison for seventeen years if he is convicted. There was a conversation about Mills testifying for him and—as best we can tell—she responded, "[Y]ou want me to say you were with me—it's not going to work." When he explains that he thinks he has a good chance at trial, she responds that "they have his [Galindo's] statement, that's all they need." The conversation ends with her repeating a story she heard from someone else that he had gotten "caught in a lie in front of the judge." In a later phone call, the call recipient discusses statements she put on Galindo's Facebook page—that he's "already proven to be a liar," "people are mad about him lying," that he "need[s] to go down there and tell the truth" after all the "lying" he's "already been doing."[8]

The State asserts the statements by the recipients of Buchanan's calls were not offered to prove the truth of the matter asserted but instead offered as context to Buchanan's statements, and thus, the statements are not hearsay.

The State also relies on *Enderle*, and while not directly on point, we find that case persuasive. In *Enderle*, the court concluded police officer statements "made during interrogations are not 'testimony' given by witnesses at trial and [are] not offered to impeach the defendant." *Id.* at 443. Like the officers' statements in *Enderle*, Mills' statements provide context for the defendant's responses. *See* Iowa R. Evid. 5.106.[9]

---

[8] Buchanan mistakenly asserts these statements were about him.
[9] Rule 5.106 provides:

> (a) If a party introduces all or part of . . . [a] recorded statement, an adverse party may require the introduction, at that time, of any other part . . . that in fairness ought to be considered at the same time.
>
> (b) Upon an adverse party's request, the court may require the offering party to introduce at the same time with all or part of the . . . recorded statement, any other part or any other . . . recorded statement that is admissible under rule 5.106(a). Rule 5.106(b), however, does not

We agree with Buchanan the better practice would have been to redact these statements but, for the reasons previously stated, we do not lay this blame upon defense counsel in light of counsel's objection. Even if *Enderle* is inapplicable to these facts, given the strength of the case against Buchanan, we conclude Buchanan has not shown that but for the admission of the objected to statements, the result of the proceedings would have been different. Further, Buchanan instigated much of the discussion by asking Mills to testify for him, knowing the call was being recorded. We find it difficult to conclude he was unduly prejudiced by Mills's responses when he continued the recorded conversation about his chances at trial.

Here, Buchanan admitted going to J's to demand money from Galindo. Several witnesses testified he was armed with a pistol, demanded money from Galindo, and took his coat. He also acknowledged he had lied to police that he was not at J's the night of the incident. His claim of ineffective assistance of counsel thus fails.

**IV. Conclusion.**

The State's case was based upon Buchanan taking the jacket at gunpoint from Galindo. It was for the jury to determine what Buchanan's intent was in taking Galindo's jacket. The jury was properly instructed on specific intent and we are not convinced Buchanan has suffered any prejudice as a result of the claim-of-right jury instruction. Buchanan cannot establish his trial attorney breached an

---

limit the right of any party to develop further on cross-examination or in the party's case in chief matters admissible under rule 5.106(a).

essential duty in failing to raise a claim-of-right defense and his ineffective-assistance-of-counsel claim thus fails. With respect to his juror challenge, Buchanan must show that the result was a juror being seated who was not impartial, which Buchanan has not attempted to do. Finally, we find no prejudicial error in the admission of the recorded jail phone calls.

**AFFIRMED.**